784 F.2d 674
 PRESIDIO ENTERPRISES, INC., Investors Un Ltd. d/b/a Village
Cinema Four, & Lakehills Cinema, Ltd.,
Plaintiffs-Appellees, Cross-Appellants,
v.
WARNER BROS. DISTRIBUTING CORP., Defendant-Appellant, Cross-Appellee.
 No. 84-1693.
 United States Court of Appeals,
Fifth Circuit.
 March 12, 1986.
 
 Stuart Robinowitz, Lewis R. Clayton, Alan Pfeffer, New York City, Strasburger & Price, R. Chris Harvey, Gary W. Davis, Jr., Dallas, Tex., Jack D. Maroney, Austin, Tex., for defendant-appellant, cross-appellee.
 Philip K. Maxwell, Longley & Maxwell, Mark L. Kincaid, John E. Athey, Austin, Tex., for plaintiffs-appellees, cross-appellants.
 Appeals from the United States District Court for the Western District of Texas.
 Before GOLDBERG, JOLLY and HIGGINBOTHAM, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 The distinctly unsettling thought of angry "killer bees" terrorizing an unsuspecting Texas town lies at the heart of this case. Appellant Warner Bros. thought it could turn this idea into a "chilling, riveting, harrowing, cinematic experience," and spent $10 million trying to do so. Appellee Presidio Enterprises was apparently similarly affected, for it agreed to pay Warner $65,000 for the right to show the film, sight unseen, at two of its theatres in Austin, Texas. To make a long story short, the film was a flop. Stung by this turn of events, Presidio flew enraged into federal court, where it somehow managed to persuade a judge and jury that it had been tricked into purchasing a defective product and could collect damages under Texas consumer protection law. Through the vagaries of statutory provisions, Presidio was able to turn its damages of $56,000 into a judgment of more than $500,000. We reverse.
 
 
 2
 In Part I the essential factual and procedural background to the case is set out. In Part II we analyze Warner's representations concerning its film as expressions of opinion that are not actionable at common law. In Part III we conclude that the so-called "special knowledge" exception to the opinion rule is inapplicable, because Warner's expressions of opinion are merely dealers' talk or "puffery." As explained in Part IV, our common law analysis is not altered by the statutory provisions of the Texas consumer protection act under which Warner was found liable. Thus we conclude in Part V that Warner's representations are not actionable as a matter of law.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 Plaintiffs-appellees Presidio Enterprises et al. ("Presidio") are experienced film exhibitors who own and successfully operate five movie theatres (with a total of 18 screens); their operations in Austin, Texas, date back to 1973. Transcript of Proceedings ("Tr.") at 133, 308-14. Defendant-appellant Warner Bros. Distributing Corporation ("Warner") is a major motion picture distributor; it licenses exhibitors to show films under copyright. Tr. at 317.[1]
 
 
 4
 In late 1977 Warner was completing filming of a movie entitled The Swarm, which concerned an invasion of Texas by "killer bees" from South America. The Swarm was based on a best-selling novel by Arthur Herzog and was directed by Irwin Allen, who had an Oscar award to his credit and had recently produced two enormously successful "disaster" films, The Poseidon Adventure and The Towering Inferno. Tr. at 437-38, 440, 499. The cast of The Swarm included such well known stars as Michael Caine, Richard Chamberlain, Olivia de Havilland, Patty Duke Astin, Henry Fonda, Ben Johnson, Slim Pickens, Katharine Ross, and Richard Widmark. Tr. at 439. The production budget for The Swarm was about $10,000,000. Tr. at 1847, 1851-52.
 
 
 5
 The Swarm was scheduled for release in July, 1978. As is the practice with such productions, Warner began advertising the film to potential exhibitors far in advance of the release date. In August, 1977, Warner sent Presidio and other exhibitors a brochure that read as follows:
 
 August 22, 1977
 Dear Mr. Exhibitor:
 
 6
 "THE SWARM" IS COMING!
 
 
 7
 Today, shooting started at Warner Bros. on your blockbuster for the summer of '78.
 
 
 8
 "THE SWARM" IS COMING!
 
 
 9
 From the man who brought you the stunning successes of "THE POSEIDON ADVENTURE" and "THE TOWERING INFERNO" now comes what we hope to be the greatest adventure-survival movie of all time.
 
 
 10
 "THE SWARM" IS COMING!
 
 
 11
 After more than two years of preparation, that master showman, Irwin Allen, combines terror, suspense and startling performances in an eleven million dollar spectacular intended for audiences of all ages.
 
 
 12
 "THE SWARM" IS COMING!
 
 
 13
 Starring Michael Caine, Katharine Ross, Richard Widmark, Olivia de Havilland, Ben Johnson, Lee Grant, Patty Duke Astin, Slim Pickens, Bradford Dillman, and Henry Fonda as Dr. Krim, this will be the most "want-to-see" movie of the year.
 
 
 14
 "THE SWARM" IS COMING AND AVAILABLE July 14, 1978!
 
 Sincerely,/s/Terry Semel
 
 15
 Plaintiff's Exhibit 2. Warner also ran similar advertisements in the trade press at this time. See Plaintiff's Exhibit 1.
 
 
 16
 In December, 1977, Warner sent Presidio and other exhibitors a second brochure, which read as follows:
 
 December 1, 1977
 Dear Exhibitor:
 
 17
 "THE SWARM" IS COMING!
 
 
 18
 Today, shooting was completed on your summer of '78 blockbuster.
 
 
 19
 "THE SWARM" IS COMING!
 
 
 20
 From Irwin Allen, the man who brought you astronomical grosses with "The Poseidon Adventure" and "The Towering Inferno" now comes one of the greatest adventure-survival movies of all time.
 
 
 21
 "THE SWARM" IS COMING!
 
 
 22
 And with it one of the greatest casts ever assembled for a motion picture; Michael Caine, Katharine Ross, Richard Widmark, Olivia de Havilland, Henry Fonda, Fred MacMurray, Richard Chamberlain, Jose Ferrer, Patty Duke Astin, Lee Grant, Bradford Dillman, Ben Johnson, and Slim Pickens.
 
 
 23
 "THE SWARM" IS COMING!
 
 
 24
 It is a chilling, riveting, harrowing, cinematic experience.
 
 
 25
 It promises to be Irwin Allen's biggest and best to date.
 
 
 26
 Sincerely,
 
 
 27
 /s/ Terry Semel
 
 TERRY SEMEL
 Executive Vice President
 General Sales Manager
 
 28
 Plaintiff's Exhibit 4. This brochure also stated:
 
 Bigger than
 
 29
 "The Towering Inferno"
 
 More Exciting than
 
 30
 "The Poseidon Adventure"
 
 From the man
 
 31
 who brought you both.
 
 
 32
 Id. Warner also ran similar advertisements in the trade press at this time. See Plaintiff's Exhibit 3.
 
 
 33
 On or about December 16, 1977, Warner sent a letter to Presidio and other exhibitors soliciting bids for The Swarm. The bid letter was typed on Warner Bros. Distributing stationery and began as follows:
 
 December 16, 1977
 Dear Exhibitor:
 
 34
 Irwin Allen, whose last two pictures--"TOWERING INFERNO" and "POSEIDON ADVENTURE"--generated over $100 million at the domestic boxoffice, brings you yet another giant spectacular--"SWARM."
 
 
 35
 The film, based on the Arthur Herzog best-seller, is produced and directed by Irwin Allen from a screenplay by Sterling Silliphant.
 
 
 36
 "SWARM", the story of an invasion of the United States by billions of South American killer bees, reunites six Oscar winners in their first film venture together since the top-grossing "TOWERING INFERNO" and "POSEIDON ADVENTURE". They include Irwin Allen, Sterling Silliphant; special-effects expert, Bill Abbott; cinematographer, Fred Koenekamp; editor, Harold Kress; and composer-conductor, John Williams.
 
 
 37
 It stars Michael Caine, Katherine Ross, Richard Widmark, Henry Fonda, Olivia deHavilland, Lee Grant, Patty Duke Astin, Ben Johnson, Slim Pickens, and Bradford Dillman.
 
 
 38
 "SWARM" will be available in the Austin area on or about July 14, 1978, on an exclusive or non-exclusive basis for a maximum of two (2) runs.
 
 
 39
 Since the film is not yet complete, we will not be able to screen it at this time. This letter is being sent to you as a solicitation for a bid. If a bid is submitted by you and accepted by Warner Bros. such offer will be noncancellable.
 
 
 40
 Plaintiff's Exhibit 5, at 1.
 
 
 41
 In effect, Presidio was being invited to bid for the exhibition rights to the film sight unseen. This practice, known as "blind bidding," is relatively common in the film industry.[2] It apparently makes economic sense for both distributors and exhibitors to reserve theatres and films far in advance of the important Christmas and summer viewing seasons. Distributors want to be sure their films are solidly booked before they set in motion their expensive advertising campaigns (in this case, Warner spent over $4,000,000 advertising The Swarm, Tr. at 1381-82), and exhibitors want to be sure they have promising films to show during periods of peak attendance. At any rate, The Swarm was blind bid, and Presidio knew that it was being invited to bid on a film that would not be complete or available for viewing until months later.[3]
 
 
 42
 In its bid letter Warner suggested a minimum "guarantee" of $35,000 for The Swarm. Plaintiff's Exhibit 5, at 2.[4] The "guarantee" is a fixed minimum amount to be paid in advance to the distributor, whatever the film grosses; if it grosses more than the guarantee, the exhibitor may also (depending on the contractual terms that have been worked out) have to pay a percentage of receipts over and above the guarantee. Presidio responded with bids of $35,000 and $30,000 as the guarantees for eight-week runs at two of its theatres;[5] its remaining terms closely mirrored those suggested by Warner. Compare Plaintiff's Exhibit 5 (Warner's bid letter) with Plaintiff's Exhibit 6 (Presidio's bids). Warner accepted Presidio's bids on January 30, 1978, and returned signed and completed copies of its standard form contracts to Presidio. Plaintiff's Exhibits 8-9.
 
 
 43
 The Swarm opened as scheduled on July 14, 1978. It was not a big success. The film ran for only five weeks at one of Presidio's theatres, and four weeks at the other. Presidio calculated that, after subtracting the guarantees and operating expenses from box office revenues, it had sustained a loss of $56,056.69. Tr. at 753-58.
 
 
 44
 Instead of accepting this result as an unsuccessful business venture, Presidio brought suit against Warner in federal district court, alleging common law fraud and negligent misrepresentation. Presidio also charged that Warner had violated the Texas Deceptive Trade Practices--Consumer Protection Act ("DTPA") by engaging in "false, misleading or deceptive acts or practices" (Sec. 17.46(a)); misrepresenting The Swarm 's "characteristics and benefits" (Sec. 17.46(b)(5)) and its "quality" (Sec. 17.46(b)(7)); and acting "unconscionably" (Sec. 17.45(5)). Plaintiff's Fourth Amended Complaint paragraphs 30-35. A jury found Warner liable, by special interrogatories, under DTPA Secs. 17.46(b)(5), (7) and 17.45(5); on all other counts Warner prevailed. The district court entered judgment in Presidio's favor with an award of $521,483.23, which included trebled damages, attorney's fees, prejudgment interest, and costs. Warner appeals from this judgment, and Presidio has filed a cross-appeal limited to the district court's refusal to treble prejudgment interest. Appellee's Brief at 3.
 
 II. EXPRESSIONS OF OPINION
 
 45
 The first obstacle in Presidio's path is the rule that expressions of opinion are not actionable. This is a wise and sound principle that is deeply embedded in the common law. Deming v. Darling, 148 Mass. 504, 20 N.E. 107 (1889); cf. Gertz v. Robert Welch, 418 U.S. 323, 339-40, 94 S.Ct. 2997, 3006-07, 41 L.Ed.2d 789 (1974). Opinions and beliefs reside in an inner sphere of human personality and subjectivity that lies beyond the reach of the law and is not subject to its sanctions. In the criminal law, for example, it may be useful for investigative purposes to ascribe "motives" to suspects; and the mens rea or "guilty mind" makes overt actions blameworthy; but these subjective states are themselves not considered criminal as such.[6] Similarly, actions for fraud or misrepresentation must be based on objective statements of fact, not expressions of personal opinion. The law wisely declines to tread in the latter area because, in some deep sense, "everyone is entitled to his own opinion." "Chacun a son gout" and "De gustibus non est disputandum" are time-honored expressions of this principle.[7]
 
 
 46
 A statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification.[8] The statements complained of by Presidio fail on both counts.
 
 
 47
 We turn first to the brochure of August 22, 1977. Here Warner announces that " 'THE SWARM' IS COMING!" and that "Today, shooting started at Warner Bros." on the film, assertions that Presidio does not dispute. It is probably also indisputable that Warner "hope[d]" The Swarm would be "the greatest adventure-survival movie of all time." But then Mr. Semel goes on to term the film "your blockbuster for the summer of '78," and states that "this will be the most 'want-to-see' movie of the year." Plaintiff's Exhibit 2. These assertions are disputable, but they are not statements of fact for two reasons: (1) they turn on vague, essentially indefinable terms;[9] (2) they are predictions.[10]
 
 
 48
 If we interpret Mr. Semel's phrase "your blockbuster for the summer of '78" as implying a statement of the form, "This film will be a blockbuster in the summer of '78," we encounter the problem of vagueness with the term "blockbuster." What does it mean? According to Webster's New World Dictionary of the American Language (College ed. 1966), a blockbuster is "a large bomb that is dropped from an airplane and can demolish an entire city block." Id. at 157. Webster's Seventh New Collegiate Dictionary (1965) elaborates that the term can be used of "something or someone notably effective or violent," id. at 91, and the American Heritage Dictionary of the English Language (1976) adds that it may refer to "Anything of devastating effect," id. at 142. We would be hard pressed to deny that The Swarm might qualify as a "blockbuster" under one or more of these definitions. Even Charles Chick, president of Presidio, seems unsure as to the meaning of the term; on direct examination he testified as follows: "By 'blockbuster,' I guess they mean it's going to do good box office business, be an important box office picture." Tr. at 166. A party complaining about the fraudulent and misleading use of language should, at the very least, know what he is complaining about. The term "blockbuster" is inherently vague; it can mean just about whatever Terry Semel wants it to, and that is probably why he used it.
 
 
 49
 Even if we interpret Mr. Semel's assertion in the way Presidio prefers, we still encounter the problem that it is a prediction, not a statement of fact. Assuming, arguendo, that Mr. Semel is saying something to the effect that "The Swarm will be far more profitable than your average summer of '78 film"--would that be a statement of fact? Does it admit of being adjudged true or false? Can it be empirically verified? We answer "no" on all counts.
 
 
 50
 A prediction, or statement about the future, is essentially an expression of opinion.[11] When the weatherman says "It will rain tomorrow," he comes closest to making a verifiable statement of fact by correcting himself and rephrasing as follows: "I think (or: it is my opinion) that it will rain tomorrow." Another possible rephrasing is: "The readings on my instruments are now the way they usually are when rain is coming." (The first statement is a factual report on the weatherman's state of mind; the second is a factual report on the state of his instruments. Both can be empirically verified.) The weatherman does not know whether it will in fact rain tomorrow. No one does. Thus no one knows whether the statement is true or false; perhaps it would be better to say that it is neither true nor false.[12] A statement about the future can be verified only in the future; but then, of course, it is no longer a statement about the future as such. When tomorrow finally comes, and it is indeed raining, one no longer says "It will rain tomorrow" but rather "It is now raining." That statement can be empirically verified as true or disconfirmed as false.
 
 
 51
 Complaining that a film turned out to be a flop six months after binding, "non-cancellable" bids on it were accepted is like suing the weatherman because rain spoiled a picnic when he predicted fair skies.[13] When Terry Semel says "this will be the most 'want-to-see' movie of the year," he is, quite literally, speaking in the grand tradition of those who do not know what they are talking about, unless we understand him to be giving a report on the present state of his mind (e.g., "I think (or: it is my opinion) that this will be the most 'want-to-see' movie of the year"), or on the state of predictive information at his disposal (e.g., "I have reliable surveys on hand, and they indicate that folks will be swarming on to my movie next summer"). Under the first interpretation, the assertion is an explicit expression of personal opinion that is not actionable at law; the second interpretation goes far beyond any plausible reading of the brochure.[14]
 
 
 52
 Our analysis of the December, 1977, brochure and bid letter is similar. The film is still a "blockbuster," but now it is also a "giant spectacular," "one of the greatest adventure-survival movies of all time," and a "chilling, riveting, harrowing, cinematic experience" that "promises to be Irwin Allen's biggest and best to date." Plaintiff's Exhibits 4-5. We have difficulty discerning a single verifiable, factual claim in this excited welter of salemen's hoopla. Presidio is perhaps on strongest ground in questioning whether The Swarm could possibly "promise" to be Irwin Allen's "biggest and best" in December, 1977, but even if Mr. Semel had made the stronger claim that "It is Irwin Allen's biggest and best to date," the law provides no guidance for the assessment of this claim. "Biggest" in what sense? (The Oxford English Dictionary (1971) lists more than a dozen; see id. at 854-55). Cf. Tr. at 425 ("Q. Does 'big' and 'it's big' mean big box office? A. Yes, it could mean that.") (Testimony of Charles Chick) (emphasis added). "Best" for whom or for what purpose? If aesthetic evaluation were our task, we certainly could not simply assume that the "best" films were those that generated the highest box-office revenues; indeed, the converse relationship seems more likely. Fortunately, aesthetic evaluation is not our task, so we can note without discomfiture that the same film could find its way into a New York Times listing of the 10 Best Movies of the Year as well as a book on The Fifty Worst Movies of All Time.[15] Here, as elsewhere in the realm of opinion, one man's meat is another man's poison.[16]
 
 
 53
 III. SPECIAL KNOWLEDGE, AND "PUFFERY"
 
 
 54
 Presidio's main argument on appeal seems to be that, even if the statements it complains of are expressions of opinion, a "special knowledge" exception to the opinion rule makes them actionable. Relying heavily on Trenholm v. Ratcliff, Presidio asserts that under Texas law
 
 
 55
 statements that would otherwise be deemed mere opinions will be treated as facts, actionable as fraud, when the parties do not have equal information regarding the subject matter of the representations. Trenholm v. Ratcliff, 646 S.W.2d 927 (Tex.1983). The underlying rationale is that, lacking access to information in order to form an independent judgment, the purchaser has a right to expect the truth and to rely on the "opinions."
 
 
 56
 Appellees' Brief at 24-25 (footnote omitted).[17] We have serious reservations about this argument because: (1) Warner's representations are salemen's "puffery," which reasonable people do not take seriously; (2) Presidio's executives were experienced, professional film exhibitors who could not reasonably have relied on Warner's puffery; (3) the record amply supports Warner's contentions that its alleged "special knowledge," in the form of marketing surveys and sneak previews, was useful solely for purposes of improving the as yet incomplete film and planning advertising strategies for it;[18] and, (4) in any event, the jury found, by special interrogatories, that Warner's failure to disclose whatever special knowledge it had was not a proximate or producing cause of Presidio's damages.[19]
 
 
 57
 Presidio cites the Restatement (Second) of Torts Secs. 539, 542 (1977), in support of its "special knowledge" argument. See Appellees' Brief at 24 n. 9. But Presidio inadvertently neglects to call our attention to several highly relevant comments to the Restatement sections it cites. These comments indicate that the "special knowledge" exception is inapplicable where the opinion relied on is clearly salesmen's puffery. In explaining section 539, "Representation of Opinion Implying Justifying Facts," the Restatement comment elaborates:
 
 
 58
 The habit of vendors to exaggerate the advantages of the bargain that they are offering to make is a well recognized fact. An intending purchaser may not be justified in relying upon his vendor's statement of the value, quality or other advantages of a thing that he is intending to sell as carrying with it any assurance that the thing is such as to justify a reasonable man in praising it so highly.
 
 
 59
 Sec. 539, Comment on Subsection (2). Similarly, the Restatement amplifies its discussion of "Opinion of Adverse Party" in section 542 with the following qualifying comment:
 
 
 60
 [T]he purchaser of an ordinary commodity is not justified in relying upon the vendor's opinion of its quality or worth. For example, one who is purchasing a horse from a dealer is not justified in relying upon the dealer's opinion, although the latter has a greater experience in judging the effect of the factors which determine its value.
 
 
 61
 e. This is true particularly of loose general statements made by sellers in commending their wares, which are commonly known as "puffing," or "sales talk." It is common knowledge and may always be assumed that any seller will express a favorable opinion concerning what he has to sell; and when he praises it in general terms, without specific content or reference to facts, buyers are expected to and do understand that they are not entitled to rely literally upon the words. "Such statements, like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth." [Learned Hand, C.J., in Vulcan Metals v. Simmons Mfg. Co., (2 Cir.1918) 248 Fed. 853, 856.]
 
 
 62
 Thus no action lies against a dealer who describes the automobile he is selling as a "dandy," a "bearcat," a "good little car," and a "sweet job," or as "the pride of our line," or "the best in the American market."
 
 
 63
 Sec. 542, Comments d-e (emphasis added). The "special knowledge" exception applies typically to the opinions of specialized experts--such as jewelers, lawyers, physicians, scientists, and dealers in antiques--where their opinions are based on concrete, specific information and objective, verifiable facts. See Restatement Sec. 542, comment f.[20]
 
 
 64
 Presidio's claim that its experienced executives were hoodwinked by Warner's extravagant puffery has a distinctly hollow ring to it. The claim is facially implausible in light of the fact that Warner, all puffing aside, suggested only a relatively modest guarantee for the film, see note 4 supra; Presidio responded with what its own executives testified was only "a good medium-range bid." D. Chick Dep. at 158. As noted previously, Presidio's actual bids for several other films the same year were far higher than its bids for The Swarm, see note 5 supra, which was supposed to be "the greatest adventure-survival movie of all time." Apparently, neither side in this case let puffery interfere with its sound business judgments. Charles Chick, president of Presidio, testified as follows:
 
 
 65
 Question: It is true, isn't it, that the distributors had been using superlatives to describe their movies ever since you've been in the industry?
 
 
 66
 Answer: It is generally true. They rarely tell you when they have got a bad picture, or use a negative term in talking about their pictures.
 
 
 67
 Q. And it's because of that through the years you people at Presidio have learned to more or less go on solid facts, and make up your own business judgments?
 
 
 68
 A. We always try to make up our own business judgments.
 
 
 69
 Tr. at 2348.
 
 
 70
 Q. And it's true, isn't it, because of your constant exposure to the type of advertising we've been talking about, you learned to separate the facts from the superlatives, if you want to call it that, and the descriptive information about the pictures in these kinds of ads?
 
 
 71
 A. Yes, sir.
 
 
 72
 Q. That was true of the 1977-78 time frame?
 
 
 73
 A. Yes, sir.
 
 
 74
 Q. At the time of "The Swarm", could you separate and recognize facts from exaggeration and superlatives, that kind of thing?
 
 
 75
 A. Yes, sir, I think so.
 
 
 76
 Tr. at 436-37. Another Presidio executive testified that The Swarm 's promotional material did not even reach "the high water mark for puffery." Tr. at 2374.[21] It was no doubt for reasons of this sort that Presidio did not rely solely on Warner's representations concerning The Swarm but instead got the opinion of a paid consultant in Hollywood, whose advice was: "Don't go out on it." See note 3 supra. And, in fact, Presidio did not "go out on it":
 
 
 77
 Question: He advised you not to go out on it?
 
 
 78
 Answer: He--yes. That's what it says.
 
 
 79
 Q. You went out on it.
 
 
 80
 A. No. I don't consider that going out on it.
 
 
 81
 Q. You did not consider that to be a substantial bid?
 
 
 82
 A. I considered it to be, to some degree, substantial. I certainly don't think it was one where we bid everything we had to get the picture. We certainly didn't treat it like some others. I would say that was a good medium-range bid that we turned in. I would not say that it was--I would not call that going out on a picture.
 
 
 83
 Dick Chick Dep. at 158.
 
 
 84
 As it happens, a not insubstantial "jurisprudence of puffery" has developed in the area of film licensing and distribution. It is instructive to compare the present case with the strikingly similar "Doctor Dolittle Case," Twentieth Century-Fox Distributing Corp. v. Lakeside Theatres, Inc., 267 So.2d 225 (La.App.), cert. denied and judgment aff'd., 263 La. 365, 268 So.2d 257 (1972). There, Twentieth Century-Fox, another major film producer and distributor, had described Doctor Dolittle to exhibitors as a "blockbuster" of "road show" quality. Id. at 228-29. Like The Swarm, Doctor Dolittle was a flop. Lakeside, a disgruntled exhibitor, charged that Fox had misrepresented the quality of the picture. The court firmly rejected that argument as follows:
 
 
 85
 While the record confirms that Fox's salesman stated to Mr. Cobb that "Doctor Dolittle" should be a "blockbuster," this is merely an opinion statement on the film's money making potential. Such an obvious speculative projection is not a misrepresentation of a material fact sufficient to constitute fraud within the contemplation of LSA-C.C. art. 1847.
 
 
 86
 Id. at 229. The court added that "It is difficult to accept that Mr. Cobb, a man with 38 years' experience in the movie industry who obviously is aware of the uncertainty of public reaction, would blindly enter a contract based on the laudatory statements of a salesman." Id. Likewise, in Penfield v. Bennett Film Laboratories, 4 Cal.App.2d 306, 40 P.2d 587 (1935), the court held that a producer's statements to the effect that what he had seen of a film was "very good" and that it would be successful "if the balance was as good as that" were not actionable, "uncertainties as to actors, purchasers, and public taste being matters of general knowledge." Id. at 587; see also Dawn Associates v. Links, 203 U.S.P.Q. 831, 835 (N.D.Ill.1978) (use of the phrase "Horror Classic" is "mere 'puffing' ").
 
 
 87
 Holmes remarked of the opinion and puffery rule almost a century ago that "The rule of law is hardly to be regretted, when it is considered how easily and insensibly words of hope or expectation are converted by an interested memory into statements of quality and value, when the expectation has been disappointed." Deming v. Darling, 148 Mass. 504, 20 N.E. 107, 108-09 (1889). The rule is particularly appropriate in the film industry, which is a risky and unpredictable business even in the best of times, Tr. at 490-93, and one where promoters deal more in hopes, dreams, and images than in the more mundane widgets purveyed elsewhere. Terry Semel, Warner's General Sales Manager at the time of The Swarm's release, testified on this point as follows:
 
 
 88
 I never talk, nor do my colleagues ever talk, to other professional[s] about a comedy. We talk about a hilarious comedy or a very funny comedy. We never talk about a love story. We talk about a very tender, very moving, very emotional, tearful love story. We never talk about a war story. We talk about the greatest story ever told. We never--do not describe our business in shorthand to each other as if we were selling toaster ovens.
 
 
 89
 Tr. at 1858. Or consider Semel's description of Irwin Allen, Director and Producer of The Swarm:
 
 
 90
 Irwin Allen is a person who is basically bigger than life. I mean to a large extent [he] reminds me of what a lot of people say about Texas. He's a grand guy. He's a wonderful guy. He doesn't do anything in a small way. He doesn't make motion pictures with a star. He makes them with many stars. He doesn't have a luncheon with five people. He has to go out of his way to make sure he has the whole restaurant for you. He doesn't appear with a little tie. He has to have a big tie. He does everything in a very big way....
 
 
 91
 He was the kind of man who didn't make a two-minute speech when he got up at a theater owners' convention, but, instead, would make a one-hour speech.
 
 
 92
 He was the kind of man who would make the exhibitors stand up at the end and cheer with him and sing a pep song about how excited they are and how excited he is.
 
 
 93
 Sorry for the explanation, but that's the kind of man, a very excitable man. You did not sit and have lunch with Irwin Allen and come away bored. You sit and have lunch with Irwin Allen and charge out of the room and head toward greater destinies.
 
 
 94
 Tr. at 1853-55.
 
 
 95
 When Christopher Columbus was proposing his expedition of 1492 to King Ferdinand and Queen Isabella, he might well have committed an exaggeration or two in describing his signularly improbable undertaking.[22] We shudder to consider what the consequences might have been if his every utterance had been measured against the strict terms of a Spanish Deceptive Trade Practices--Consumer Protection Act. To poets and other bold dreamers, one extends what is known as "poetic license."
 
 
 96
 Our contemporary jurisprudence is in the process of eroding a number of common law asseverations, but caveat emptor has not yet been entirely replaced in our vocabulary by caveat venditor. The motion picture industry is entitled to the same license of hyperbole, exaggeration, bombasticism, and flamboyance that the makers of toothpaste and other commodities enjoy in advertising their products. The law recognizes that a vendor is allowed some latitude in claiming merits for his wares by way of an opinion rather than an absolute guarantee, so long as he hews to the line of rectitude in matters of fact. Opinions are not only the lifestyle of democracy, they are the brag in advertising that has made for the wide dissemination of products that otherwise would never have reached the households of our citizens. If we were to accept the thesis set forth by appellees, the advertising industry would have to be liquidated in short order.
 
 
 97
 IV. THE TEXAS DECEPTIVE TRADE PRACTICES--CONSUMER PROTECTION ACT
 
 
 98
 Our common law analysis is not altered by the statutory provisions of the DTPA. Section 17.50 of the Act provides in pertinent part:
 
 
 99
 A consumer may maintain an action if he has been adversely affected by any of the following:
 
 
 100
 (1) the use or employment by any person of an act or practice declared to be unlawful by Section 17.46 of this subchapter;
 
 
 101
 (2) breach of an express or implied warranty;
 
 
 102
 (3) any unconscionable action or course of action by any person....
 
 
 103
 Texas Business and Commerce Code Sec. 17.50 (1977).[23] The provisions under which Warner was found liable are the following:
 
 Sec. 17.45. Definitions
 As used in this subchapter:
 
 104
 ....
 
 
 105
 (5) "Unconscionable action or course of action" means an act or practice which, to a person's detriment:
 
 
 106
 (A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or(B) results in a gross disparity between the value received and consideration paid in a transaction involving transfer of consideration.
 
 
 107
 ....
 
 
 108
 Sec. 17.46 Deceptive Trade Practices Unlawful
 
 
 109
 (a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
 
 
 110
 (b) The term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:
 
 
 111
 ....
 
 
 112
 (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;
 
 
 113
 ....
 
 
 114
 (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another....
 
 
 115
 Texas Business and Commerce Code Secs. 17.45, 17.46 (1977). The DTPA then goes on to treat such subjects as "representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand" (Sec. 17.46(b)(6)), "representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced" (Sec. 17.46(b)(21)), and "disconnecting, turning back, or resetting the odometer of any motor behicle" (Sec. 17.46(b)(16)).
 
 
 116
 In construing the DTPA the Texas Supreme Court has declared that "Misrepresentations, so long as they are of a material fact and not merely 'puffing' or opinion, are ... actionable...." Pennington v. Singleton, 606 S.W.2d 682, 687 (Tex.1980) (emphasis added). In Pennington, the defendant's statements were found to be "false and not merely statements of opinion or puffing. As such, they fell within the prohibitions of Sec. 17.46(b)(5) and (7)." Id. at 689 (emphasis added).[24] Similarly, in construing the Federal Trade Commission Act, upon which the DTPA was patterned and to which Texas courts look in interpreting the DTPA, see Royal Globe Insurance Co. v. Bar Consultants, Inc., 577 S.W.2d 688, 694 (Tex.1979), courts have rejected claims based on opinions or salesmen's puffery. See, e.g., Carlay Co. v. Federal Trade Commission, 153 F.2d 493, 496 (7th Cir.1946) ("such words as 'easy,' 'prime,' 'amazing,' 'perfect,' 'wonderful,' 'excellent,' are regarded in law as mere puffing or dealer's talk upon which no charge of misrepresentation can be based").[25]
 
 
 117
 The inapplicability of the DTPA to subjective opinions on aesthetic matters is particularly manifest in the provisions of section 17.46(b)(7) referring to the "standard, quality, or grade" of "goods or services." The Texas Supreme Court has defined "quality" under this section as "a measure of degree; as to particular goods quality may be calibrated by standard or grade, as with eggs or meat, or specified by style or model, as with machinery." Pennington, 606 S.W.2d at 687 (emphasis added). It goes almost without saying that the quality of motion pictures cannot be "calibrated" in this way. See Part II supra. No matter how one slices them, artistic works simply do not belong on a slab alongside "eggs, meat, and machinery," and we decline to put them there unless and until the legislature and courts of Texas indicate that Texas law departs in this respect from the salutary principles of the common law.
 
 
 118
 Presidio places great emphasis upon the fact that "Nowhere in the DTPA is 'puffing' listed as a defense." Appellees' Brief at 21. But the Texas legislature has also declined several pointed invitations to regulate film distribution or otherwise bring motion picture licensing explicitly within the terms of the DTPA. See, e.g., S.B. 820 (1979) (not enacted); H.B. 1087 (1981) (not enacted); S.B. 523 (1981) (not enacted); cf. D. Chick Dep. at 65-67. As Presidio correctly points out, "The Legislature acts by acting, not through inaction," and therefore "reliable conclusions as to legislative intent cannot be drawn from the failure of the Legislature to enact legislation ..." Id. at 31, 32. Acknowledging that "The DTPA does not represent a codification of the common law," Smith v. Baldwin, 611 S.W.2d 611, 616 (Tex.1980), we nonetheless apply common law principles where the legislature has not acted. "[T]he judge ... legislates only between gaps. He fills the open spaces in the law ... without traveling beyond the walls of the interstices...." B. Cardozo, The Nature of the Judicial Process 113-14 (1949).
 
 V. CONCLUSION
 
 119
 The nub of Presidio's case is its charge of misrepresentation. Presidio must show that (1) Warner misrepresented its film; and (2) that Warner's misrepresentations were the cause of Presidio's injury.[26] We conclude on the basis of the foregoing analysis that Warner's representations concerning its film The Swarm are not actionable as a matter of law. Since we dispose of the case in this way we need not reach the other issues raised on appeal.
 
 
 120
 Accordingly, we set aside the verdict, vacate the judgment, and direct the district court to dismiss Presidio's complaint.
 
 
 121
 REVERSED.
 
 
 
 [1]
 Warner Bros. Distributing Corporation is a wholly owned subsidiary of Warner Bros. Inc., which in turn is a wholly owned subsidiary of Warner Communications, Inc. Tr. at 781
 
 
 [2]
 Tr. at 1831-42. Some of Warner's most successful films, such as All the President's Men and Superman I, were blind bid. Id. at 1840
 
 
 [3]
 Before making its bid Presidio also had the benefit of advice from a paid consultant in Hollywood, Mr. Jim Leroy, an "experienced film buyer" with "very close ties to the motion picture community." Tr. at 635-36. Mr. Leroy pointed out problems with The Swarm and advised "Don't go out on it." Id. at 636. (" 'Don't go out on it' means don't sell the farm and family jewels and everything to buy this picture...." Id.)
 
 
 [4]
 This was not a particularly high suggested guarantee. By comparison, other films offered around that time had the following suggested guarantees: Goin' South --$60,000 (blind bid by Paramount Pictures); Grease --$60,000 (blind bid by Paramount); Damien-Omen II --$80,000 (Twentieth Century-Fox); The Deep --$85,000 (blind bid by Columbia Pictures). Defendant's Exhibits 1134, 961, 986, 808
 
 
 [5]
 These were not top-dollar bids. During the same season Presidio bid $55,000 for Revenge of the Pink Panther and $50,000 for Jaws II. Tr. at 485-88
 
 
 [6]
 See J. Lukacs, Historical Consciousness 162-63 (1968)
 
 
 [7]
 Cf. Mr. Chow of New York v. Ste. Jour Azur S.A., 759 F.2d 219 (2d Cir.1985) (restaurant review); Trump v. Chicago Tribune, 616 F.Supp. 1434 (S.D.N.Y.1985) (architecture review); Greenbelt Cooperative Publishing Ass'n. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); Old Dominion Branch No. 496 v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974)
 
 
 [8]
 See A.J. Ayer, Language, Truth and Logic 35-39 (1952) ("for a statement of fact to be genuine some possible observations must be relevant to the determination of its truth or falsehood"); Ollman v. Evans, 750 F.2d 970, 978-84 (D.C.Cir.1984) (courts should consider whether a statement is "objectively capable of proof or disproof" because "a reader cannot rationally view an unverifiable statement as conveying actual facts")
 
 
 [9]
 See Ollman, 750 F.2d at 979-81 (criterion of precise or definite meaning)
 
 
 [10]
 See id. at 981-82 (criterion of verifiability)
 
 
 [11]
 See Prosser & Keeton, The Law of Torts, ch. 18 Sec. 109, at 762 (5th ed. 1984) ("Ordinarily a prediction as to events to occur in the future is to be regarded as a statement of opinion only, on which the adverse party has no right to rely. It was said very early that 'one cannot warrant a thing which will happen in the future,'....") (footnote omitted)
 
 
 [12]
 See Aristotle De Interpretatione, ch. 9; C.D. Broad, Scientific Thought, ch. 2 (1923); G. Ryle, Dilemmas, ch. 2 (1962); A.N. Prior, Time and Modality, 84-86 (1957); M. Dummett, Truth and Other Enigmas, chs. 1, 10 (1978)
 
 
 [13]
 It is not germane to point out, as Presidio does in its brief, that "Had Warner trade screened the 'Swarm' prior to requiring bids, Presidio would not have bid on the picture." Appellees' Brief at 17. The whole point of a speculative enterprise like blind bidding is that one does not, and cannot, know precisely what one is bidding on at the time binding, "non-cancellable" bids are required. And, in fact, the uncertainty associated with blind bidding is one of the factors Presidio considered when deciding how much to bid on a film. Tr. at 490-92
 Presidio's theory of damages (actual box office receipts minus guarantees and operating expenses) is similarly flawed. One might as well complain that a futures contract declined in value after the date it was purchased. See note 26 infra.
 
 
 [14]
 See Part III infra
 
 
 [15]
 See Appellant's Brief at 26. The film was Last Year at Marienbad
 
 
 [16]
 Cf. Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 510, 101 S.Ct. 2882, 2893, 69 L.Ed.2d 800 (1981) (plurality opinion) ("aesthetic judgments are necessarily subjective, defying objective evaluation"); Trump v. Chicago Tribune Co., 616 F.Supp. 1434, 1436 n. 6 (S.D.N.Y.1985) (discussing divergent views of the Eiffel Tower)
 
 
 [17]
 Presidio's reliance on Trenholm v. Ratcliff is misplaced. Trenholm concerned factual representations made by a land developer to potential home builders. The builders were worried about an undesirable trailer park located near lots they were considering purchasing. Ratcliff reassured them as follows:
 Don't worry about it, that's zoned commercial, and that property has already been sold. Those people have been notified that their leases will not be renewed, so the park should close up sometime in April and after that, why, after they get everything moved out over there, they will come in and bulldoze it down so by June or July it will be like there's never been a park there, and that will coincide actually just fine with the grand opening out there.
 
 
 [646]
 S.W.2d at 929. Trenholm then purchased lots and built 18 houses on the land, but the trailer park was not moved by the time the houses were completed for sale, and he suffered a net loss. The court upheld Trenholm's claim of common law fraud with the following observations:
 Ratcliff's representation was not merely an expression of an opinion that the trailer park would be moved in the future. He falsely represented that the trailer park had been sold, and that notices had been given to the tenants. These are direct representations of present facts which are so intertwined with his future prediction that the whole statement amounts to a representation of facts.
 ....
 ... A finding of special knowledge ... is unnecessary to support a fraud judgment in this case. Ratcliff made misstatements of present facts which, coupled with his future prediction, justified reliance upon his opinion and transformed his statement into a representation of fact.
 Id. at 930-31, 933.
 
 
 [18]
 See Tr. at 1506-08, 1515-16 (use of sneak previews is "strictly a diagnostic procedure"), 1539
 
 
 [19]
 See answers to Interrogatories 5(A), 17
 
 
 [20]
 See also Davis v. Commercial Standard Insurance Co., 194 S.W.2d 599, 603 (Tex.Civ.App.--Dallas 1946), writ refused, n.r.e.; United States Pipe & Foundry Co. v. City of Waco, 130 Tex. 126, 108 S.W.2d 432, 435-37, cert. denied, 302 U.S. 749, 58 S.Ct. 266, 82 L.Ed. 579 (1937); Ruberoid Co. v. Briscoe, 293 F.2d 712, 715-16 (5th Cir.1961)
 
 
 [21]
 Presidio was apparently so accustomed to dealing with film promoters' hyperbole that it even had a special stamp made up with which it could imprint the word "bullshit" on the more flagrantly offending documents. For example, the bid solicitation letter for Funny Lady began as follows:
 Just a few times in the life of a great producer, he makes a movie that will long be remembered when all his others appear to be forgotten.... [W]e at Columbia Pictures feel that Ray Stark's latest production "Funny Lady" might just be that one picture that will rise to the greatest heights of all. To put it simply, "Funny Lady" in our opinion is what motion pictures were meant to be, and what entertainment is all about.
 It's with the thrill of a lifetime that we announce the availability of "Funny Lady" for Easter, 1975.
 Defendant's Exhibit 436, at 1. This letter was found in Presidio's files, stamped with the special "bullshit" stamp. Id. at 2. The distributor had suggested a $75,000 guarantee; Presidio bid $18,750. Appellant's Brief at 43.
 
 
 [22]
 Cf. 6 Encyclopedia Britannica 112-15 (1965):
 The king and queen were stunned by his audacity. He held his ground so firmly that no compromise was possible.... Once the three ships finally lost sight of land (Sept. 9) the greatness of Columbus began to reveal itself, for it was at this moment that he conquered by faith and will power the resistance of the unbelieving and faint-hearted.... His mind was lofty and imaginative, and so taut that his actions, thoughts and writings do at times suggest a man just this side of the edge of insanity.
 
 
 [23]
 The provisions of the DTPA in effect when the alleged misrepresentations occurred govern the disposition of this case. See Woods v. Littleton, 554 S.W.2d 662, 666 (Tex.1977); Pennington v. Singleton, 606 S.W.2d 682, 685 n. 1 (Tex.1980). All references in this opinion to the DTPA are to the Act in effect at that time
 
 
 [24]
 Cf. Jeffcoat v. Phillips, 534 S.W.2d 168, 171-72 (Tex.Civ.App.--Houston [14th Dist.] 1976), writ refused, n.r.e.; Shaw Equipment Co. v. Hoople Jordan Construction Co., 428 S.W.2d 835, 837-39 (Tex.Civ.App.--Dallas 1968)
 
 
 [25]
 Cf. Herbold Laboratory, Inc. v. United States, 413 F.2d 342 (9th Cir.1969); In re Sterling Drug, Inc., F.T.C. Docket No. 8914, 3 Trade Reg.Rep. p 22,124 at 22,909 n. 12 (July 5, 1983); In re Pfizer, Inc., 81 F.T.C. 23, 64 (1972); In re National Executive Search, Inc., 76 F.T.C. 962, 1009-10 (1969); In re Better Living, Inc., 54 F.T.C. 648, 653 (1957)
 
 
 [26]
 Even Presidio's "unconscionability" issue--which involves a claim that Warner took advantage of Presidio's lack of knowledge or experience "to a grossly unfair degree" or that there was a "gross disparity" between what Presidio paid and what it received--stands or falls on such a showing. On the first point, we have openly questioned whether Presidio's executives could in any relevant way be described as naive or inexperienced; in any event, the jury found that Warner had not acted in bad faith, see answers to Interrogatories 8, 12, and that Warner's failure to disclose information about the film was not a proximate or producing cause of Presidio's injury, see answers to Interrogatories 5(A), 17. On the second point, we simply note that Presidio wholly failed to introduce evidence as to the "value received" at the time of the contract. See note 13 supra
 Similarly, the jury's verdict under section 17.46(b)(5) must be set aside because it was based solely on alleged misrepresentations by Warner after the time of licensing. See answers to Interrogatory 7(B).