723 A.2d 502

**James Henry McGRAW**

v.

**LOYOLA FORD, INC.**

**No. 505, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Jan. 28, 1999.

562

564

David Albright (Daniel T. Corrigan and Albright, Brown & Goertemiller on the brief), Baltimore, for appellant.

Kimberly Dunn Spelman (Steven F. Wrobel and Martin, Junghans, Snyder & Bernstein, P.A. on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and HOLLANDER and KENNEY, JJ.

HOLLANDER, Judge.

James Henry McGraw, appellant, instituted suit in the Circuit Court for Baltimore City against Loyola Ford, Inc. (hereinafter, the "dealer" or "Loyola Ford"), appellee, and Chrysler Credit Corporation ("Chrysler Credit").[1] The claims arose from appellant's purchase in December 1994 of a 1994 Ford Thunderbird, and his subsequent trade of that vehicle, in May 1995, for a 1995 Ford Taurus SHO. In particular, appellant alleged claims for usury, in violation of Maryland's Retail Installment Sales Act (hereinafter, the "RISA"), Md.Code (1975, 1990 Repl.Vol., 1994 Cum.Supp.), §§ 12–609(a), (g) of the Commercial Law Article ("C.L."), intentional misrepresentation, and unfair and deceptive trade practices, in violation of Maryland's Consumer Protection Act, Md.Code (1975, 1990 Repl.Vol., 1994 Cum.Supp.), C.L. § 13–301 et seq. (hereinafter, the "CPA" or the "Act"). After the circuit court granted Loyola Ford's motion for summary judgment, appellant timely noted his appeal. He presents several issues for our review, which we have reformulated:

I. Did the circuit court err in granting summary judgment as to appellant's claim of unfair and deceptive trade practices, in violation of the CPA?

II. Did the circuit court err in granting summary judgment as to appellant's common law claim for intentional misrepresentation?

III. Did the circuit court err in granting summary judgment as to appellant's usury claims under the RISA?

We answer the first two questions in the negative. As to the third question, for the reasons set forth in Section III(B), we shall, in part, vacate the entry of summary judgment as to Count II, and remand for further proceedings. *See* Md. Rule 8–604.

---

1. Chrysler Credit is not a party to this appeal.

## Factual Summary

On December 27, 1994, appellant purchased a new 1994 Ford Thunderbird automobile from Loyola Ford. On the same date, he entered into a retail installment contract, by which the vehicle was financed at a rate of 16.88% per annum over a period of five years. In the weeks following the purchase, McGraw experienced a variety of difficulties with the car, including a faulty brake rotor, a defective light bulb, a squeaky window, and shaking of the steering wheel when the car was driven at low speeds. Because appellant was "very unhappy" with the performance of the Thunderbird, he brought the vehicle back to Loyola Ford for repairs on several occasions. Appellant advised the dealer that "[he] was considering legal action under Maryland's 'lemon' laws." He did not pursue his "lemon law" claim, however. Instead, appellant chose to replace the Thunderbird with a 1995 Taurus SHO. The dealer's actions with respect to the Taurus are the focus of appellant's appeal.

On September 17, 1996, appellant filed a two-count complaint against Loyola Ford, arising from his purchase of the Taurus. In Count I, appellant alleged that Loyola Ford engaged in unfair and deceptive trade practices, in violation of C.L. § 13–301. The claim was based on Loyola Ford's alleged misrepresentation on the buyer's order that the Taurus was "new," and its assertion that the Taurus had "the most outstanding value ... in the dealership; every consideration in pricing and/or trade in allowance has been given to reduce the settlement price to its lowest". Count II alleged that the interest rate charged with respect to the financing of the Taurus was usurious, in violation of C.L. § 12–609(a). Appellant sought damages of $24,288.68.

On July 24, 1997, following the close of discovery on July 7, 1997, appellant amended his complaint to add Count III, which set forth a claim for intentional misrepresentation. Thereafter, on August 25, 1997, appellee moved for summary judgment. On October 7, 1997, one month before the scheduled trial date, and shortly before the summary judgment hearing,

appellant filed a Second Amended Complaint, supplementing his usury claim. He alleged that Loyola Ford violated C.L. § 12–609(g) when it failed to disclose a "secret profit" that it realized when it assigned the retail installment contract to Chrysler Credit.[2]

Some of the information obtained during discovery was presented to the court in support of appellee's summary judgment motion. The discovery, which included a deposition of appellant and documents relevant to the transactions, is pertinent here.

At his deposition, appellant testified that, during one of his visits to Loyola Ford regarding the problems he experienced with the Thunderbird, he noticed the Taurus on the lot. Appellant decided to trade the Thunderbird for a different car, and expressed interest in the Taurus to Tony Smith, a Loyola Ford salesperson. According to appellant, Smith told him that Loyola Ford "had a good deal" on the Taurus. Smith also described the Taurus as a "top of the line car," which appellant took to mean that the car was "loaded" with extra features. The Taurus was equipped with several optional items, including a sunroof, compact disc player, leather seating, keyless entry, power seats, air conditioning, and paint and fabric protection. Appellant accompanied Smith on a test drive of the vehicle. When Smith drove the Taurus, appellant rode in the back seat, and he never looked to see how many miles were on the car.

On May 25, 1995, appellant decided to purchase the 1995 Taurus. Accordingly, he signed a "Buyer's Order" form that indicated a "base price" for the vehicle of $28,866.00, and a total price of $34,615.00, including options, delivery charge, taxes, and title service. Additionally, the document reflected an "allowance for trade in" of the Thunderbird of $17,825.00,

---

**2.** Appellee vigorously protested the belated filing of the Second Amended Complaint in a motion to strike filed on October 16, 1997. Although appellee did not file another summary judgment motion, the dealer briefly addressed appellant's new claim in a reply memorandum filed in support of its pending summary judgment motion.

less the same amount as the "balance owing" for that vehicle. The buyer's order also indicated that McGraw would pay a $3,000.00 down-payment and receive a $1,500.00 "Ford Rebate." After the down payment and the rebate, the document reflected a total balance due of $30,115.00.

The May 25 buyer's order also provided a box for the dealer to indicate whether the vehicle was "new," "used," or a "demo." Loyola Ford checked the box denoting that the vehicle was "new." The form also provided a space adjacent to the box on which to write the specific mileage of the vehicle. Immediately under the word "mileage", Loyola Ford wrote the following: "(6161K)".

In addition, the buyer's order form contained a paragraph disclosing the dealer's policy regarding the sale of demonstrator vehicles. It stated:

A demonstrator is the most outstanding value that we sell in the dealership; Every consideration in pricing and/or trade allowance has been given to reduce the settlement price to its lowest. However, every demonstrator sold may have paint touch-up, mouldings dented, an upholstery tear, wheel covers chipped, or other conditions considered visible at the time of sale. It is the policy of this dealership that no adjustments be made after the sale and after delivery, unless specifically stated on our sales contract. A squeak or touch up or mechanical adjustment will be made free of charge only within 10 working days of delivery date.

Appellant testified at his deposition that he read the May 25 buyer's order, including the preprinted portion of the form. Moreover, he conceded that Smith told him the Taurus was a demonstrator vehicle. Further, appellant testified that he understood the phrase "demonstrator vehicle" to mean a car that "had been used" by employees of the dealership to "drive back and forth to home." The following portion of appellant's deposition testimony is relevant:

APPELLEE'S COUNSEL: Before you signed the contract of sale on the Taurus, did anyone actually say to you that the Taurus was new?

APPELLANT: The '95?

APPELLEE'S COUNSEL: Uh-huh.

APPELLANT: No, nobody told me it was new.

APPELLEE'S COUNSEL: In fact, they told you it was a demonstrator, correct?

APPELLANT: Yes.

* * *

APPELLEE'S COUNSEL: Did you read this buyer's order referring to the May 25, 1995 buyer's order before signing it, Mr. McGraw?

APPELLANT: Yes, I did.

APPELLEE'S COUNSEL: Did you read everything on it?

APPELLANT: Yes. Almost everything.

APPELLEE'S COUNSEL: Did you read the preprinted information? Do you understand what I mean?

APPELLANT: No, I don't.

APPELLEE'S COUNSEL: There is a lot of preprinted text on the buyer's order, not something that the salesperson would have inserted in, but that would be on the document before writing it up for a particular customer. Do you understand what I'm asking now?

APPELLANT: Yes.

APPELLEE'S COUNSEL: And at the time that you signed this document on May 25th, 1995, you understood that the car had 6,161 miles on it; is that right?

APPELLANT: At the time I purchased it?

APPELLEE'S COUNSEL: At the time you signed this document, the buyer's order, on May 25th, 1995?

APPELLANT: Yes.

The next day, May 26, 1995, appellant entered into a retail installment sales contract with Loyola Ford for the financing of the Taurus, by which he promised to pay $31,335.00 over 60 months, with interest charged at the rate of 16.75% per annum. Thus, the total obligation under the contract, including the finance charge, was $46,797.60. Loyola Ford arranged

financing for the purchase through Chrysler Credit. A settlement sheet provided to appellant from Loyola Ford during discovery indicated that Chrysler's "APR buy rate" was 9.85%, although the retail installment contract provided that appellant was charged the rate of 16.75%.

Apparently, appellant failed to pay the $3,000.00 downpayment reflected in the May 25 buyer's order. Consequently, on May 29, 1995, appellant signed a second buyer's order form, but not another financing agreement. Unlike the May 25 buyer's order form, the box labeled "demo" was checked on the May 29 buyer's order form, rather than the box labeling the vehicle as "new." The notation "(6161K)" appeared next to the "demo" box to indicate the car's mileage. In addition, a "face up" sheet signed by appellant on May 29 indicated that the Taurus was a "demo."

The second buyer's order form contained a slightly different price calculation than the form prepared on May 25. The new form reflected a net trade-in allowance of $1000 for the 1994 Thunderbird. That amount resulted from the dealer's gross allowance for that vehicle of $18,825.00, minus the outstanding loan balance of $17,825.00. Although the space on the form labelled "Base Price" was left blank, the document reflected a total purchase price, including options, delivery charge, and taxes, of $33,615.00. After crediting appellant with the $1,500.00 "Ford Rebate" and the $1,000 net trade-in allowance, the document showed a balance due of $31,115.[3]

The Thunderbird, which the dealer accepted for the trade, had lost significant value between December 1994 and May 1995. Loyola Ford estimated the "cash value" of the Thun-

---

**3.** The record does not explain why the total amount financed in the May 26, 1995, retail installment sales contract is $220.00 more than the total balance listed in the May 29 buyer's order. Nevertheless, the May 26 retail installment sales contract reflects the downpayment terms described in the May 29 buyer's order, not the May 25 buyer's order, i.e., a $1,500.00 Ford Rebate and the $1,000.00 net trade-in allowance. As noted, a new retail installment sales contract was not executed subsequent to the May 29 buyer's order. Furthermore, for reasons that are not entirely clear, appellant considers the May 25 buyer's order, not the one completed on May 29, as "The contract of sale of the Taurus."

derbird at $12,500.00, but gave appellant a gross trade-in allowance of $18,825.00. The dealer accounted for the difference between the "cash value" and the gross trade-in allowance by adjusting the base price of the vehicle; the dealer increased the base price of the vehicle by $6,325.00, representing the amount of the "over-allowance" for the trade.

Both the May 25 and May 29 buyer's order forms contained a "Purchase Price Clarification," which advised appellant of a possible adjustment of the base price of the vehicle in connection with a vehicle trade-in. In fact, the buyer's forms include two such statements, with almost identical language: First, the forms indicate that "the actual sales price may be higher than the advertised price due to an adjustment for trade in allowance or rebate." Second, the forms state that "the actual sales price may be higher due to an adjustment for trade in allowance or rebate." McGraw's signature appears under each statement on both forms.

During his deposition, appellee's counsel questioned McGraw about the trade-in arrangement. McGraw acknowledged that he thought the trade-in was worth less than the dealer "gave" him. The following colloquy is relevant:

APPELLEE'S COUNSEL: You didn't know the value of the Thunderbird at the time you traded it in, did you?

APPELLANT: Yes.

APPELLEE'S COUNSEL: You did know?

APPELLANT: Yes, I did.

APPELLEE'S COUNSEL: What did you think the value was?

APPELLANT: What did I think the value was?

APPELLEE'S COUNSEL: Of the Thunderbird when you traded it in?

APPELLANT: I think it should have been less than what they charged me, what they gave me for it.

APPELLEE'S COUNSEL: You thought that it was worth less than what they gave you for it?

APPELLANT: Yes.

APPELLEE'S COUNSEL: Why do you think they gave you more than what you thought it was worth?

APPELLANT: I don't know why.

APPELLEE'S COUNSEL: Did you understand that the high value of the trade-in raised the price of the vehicle?

APPELLANT: Yes.

On October 27, 1997, the court held a hearing on appellee's motion for summary judgment, and granted Loyola Ford's motion as to all counts. Regarding the dealer's alleged failure to disclose the profit derived from the assignment of the retail installment sales contract, the court determined that the RISA does not provide a private civil remedy for a violation of C.L. § 12–609(g). Moreover, the court agreed with appellee that the maximum allowable interest rate for the financing transaction is governed by C.L. § 12–609(f), which permits an interest rate of up to 24%. Finally, the court rejected appellant's contention that Loyola Ford's representations on the buyer's order form were actionable under the CPA or at common law. After the court denied appellant's motion to alter or amend, McGraw timely noted this appeal.

We will include additional facts in our discussion.

### Standard of Review

Maryland Rule 2–501 provides that a trial court may grant a motion for summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993); *Bits "N" Bytes Computer Supplies, Inc. v. Chesapeake & Potomac Tel. Co.,* 97 Md.App. 557, 580–81, 631 A.2d 485 (1993), *cert. denied,* 333 Md. 385, 635 A.2d 425 (1994); *Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992). Summary judgment is not foreclosed if a dispute exists as to a fact that is not material to the outcome of the case. *Scroggins v. Dahne,* 335 Md. 688, 690–91, 645 A.2d 1160 (1994). A material fact is one that will "somehow affect the

outcome of the case." *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). In resolving the motion, the court must construe the facts, and all inferences reasonably drawn from those facts, in the light most favorable to the non-moving party. *Dobbins v. Washington Suburban Sanitary Comm.,* 338 Md. 341, 345, 658 A.2d 675 (1995); *King,* 303 Md. at 110–11, 492 A.2d 608; *Tennant v. Shoppers Food Warehouse Md. Corp.,* 115 Md.App. 381, 387, 693 A.2d 370 (1997). A party's mere formal denials of conclusory allegations are not sufficient to prevent summary judgment, however. *Tennant,* 115 Md. App. at 386–87, 693 A.2d 370; *Seaboard Sur.,* 91 Md.App. at 243, 603 A.2d 1357.

In the absence of a genuine dispute as to material fact, the appellate court must determine whether the trial court made the correct legal decision. *Beatty,* 330 Md. at 737, 625 A.2d 1005; *see also Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990); *King,* 303 Md. at 111, 492 A.2d 608. Ordinarily, we will review a trial court's decision granting summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *see Hoffman v. United Iron and Metal Co., Inc.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

## Discussion[4]

### I. Unfair and Deceptive Trade Practices

Appellant contends that the trial court erred in granting summary judgment as to Count I, alleging unfair and deceptive trade practices in violation of the CPA. Specifically, appellant complains that the buyer's order of May 25, 1995 falsely represented the Taurus as "new," although it actually had 6,161 miles on it, in violation of C.L. § 13–301(1), (2), (3), and (9). McGraw also contends that the dealer violated C.L.

---

4. We note that appellee has moved for sanctions, pursuant to Md. Rule 8–501(m), because appellant included in the record extract memoranda of law presented to the trial court. We decline to impose the requested sanctions.

§ 13-301(1), (2), (3), (6),[5] and (9) by including in the buyer's order a false representation that "[a] demonstrator is the most outstanding value that we sell in the dealership; Every consideration in pricing and/or trade allowance has been given to reduce the settlement price to its lowest." [6]

Further, appellant argues to us that the dealer's "most significant" misrepresentation was its failure to inform him that Loyola Ford received $4,780.00 when it assigned appellant's retail installment sales contract to Chrysler Credit. In his Second Amended Complaint, however, appellant asserted the "secret profit" argument only in connection with the usury claim in Count II; the claim was not asserted as part of the deceptive trade practices claim under the CPA or as a common law intentional misrepresentation. Thus, when the trial

---

5. In his brief, appellant cited C.L. § 13-301(5), but he quotes from C.L. § 13-301(6).

6. In addition, appellant asserts in a footnote of his opening brief that "[t]he actual interest rate charged by the terms of the [retail installment] contract was 17.07%. This is also a violation of Consumer Protection Law." Appellant's brief does not explain the basis for his assertion, nor what part of the consumer protection law appellee allegedly transgressed. Loyola Ford explains that the first payment on the retail installment contract was not due until July 10, 1995, which was fifteen days longer than the typical thirty-day installment period. According to appellee, interest on the additional fifteen day period was calculated at a rate of 16.75% per annum, and amortized over the sixty month period of the contract.

In his reply brief, appellant asserts that Loyola Ford's calculation violated C.L. § 12-611(c), "which does not permit installments of more than one month," and C.L. § 12-609, "which permits the charging of simple interest rate charges—not compounding." Appellant still does not explain why the rate charged was equivalent to 17.07%. Moreover, appellee has had no opportunity to respond to appellant's argument, laid out for the first time in his reply brief.

Maryland Rule 8-504(a)(5) provides that a brief shall contain an "[a]rgument in support of the party's position." Failure to articulate an argument in an opening brief constitutes a waiver of that issue. *See Health Servs. Cost Review Comm'n v. Lutheran Hosp.*, 298 Md. 651, 664, 472 A.2d 55 (1984); *Conaway v. State*, 108 Md.App. 475, 484-85, 672 A.2d 162, *cert. denied*, 342 Md. 472, 677 A.2d 565 (1996)); *see also Federal Land Bank of Baltimore, Inc. v. Esham*, 43 Md.App. 446, 457-58, 406 A.2d 928 (1979); *GAI Audio of New York v. Columbia Broadcasting System, Inc.*, 27 Md.App. 172, 183, 340 A.2d 736 (1975).

court considered the summary judgment motion, the "secret profit" issue was relevant only to appellant's claim for usury. Therefore, we will only address appellant's contention in the context of that claim. *See* Md. Rule 8–131(a).

Appellee asserts that summary judgment was appropriate because, as a matter of law, appellant was required to prove "actual deception resulting in actual injury," and appellant was not "actually deceived." Appellee points out that appellant admitted under oath that he was told, before signing the first buyer's order, that the Taurus was a demonstrator vehicle, and that it had been driven 6,100 miles. Moreover, both buyer's order forms expressly noted the vehicle's mileage at "6161K." Further, appellee contends that Loyola Ford's statements about the value of a demonstrator vehicle, and the "consideration in pricing," were merely "general commendations" that are not actionable under Maryland law.

The Legislature enacted the CPA in 1973 because of "mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit." C.L. § 13–102(a). *See Hartford Acc. and Indem. Co. v. Scarlett Harbor Associates, Ltd.,* 109 Md.App. 217, 241, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). The General Assembly recognized that "existing laws [protecting consumers were] inadequate, poorly coordinated and not widely known or adequately enforced." C.L. § 13–102(a)(2). Accordingly, the Legislature determined to "take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." C.L. § 13–102(b)(3). To effectuate the Act's purpose of "set[ting] certain minimum statewide standards for the protection of consumers across the State," C.L. § 13–102(b)(1), it is liberally "construed and applied...." C.L. § 13–105.

The Division of Consumer Protection (the "Division") is authorized to enforce the CPA. C.L. § 13–201; see C.L. § 13–401 through C.L. § 13–406. The Act also subjects violators to

criminal prosecution. C.L. § 13–411. In addition, a person aggrieved by a violation of the CPA may initiate a private cause of action for damages. C.L. § 13–408 provides, in pertinent part:

(a) *Actions authorized.*—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover *for injury or loss sustained by him* as the result of a practice prohibited by this title.

(Emphasis added).

Maryland cases interpreting C.L. § 13–408(a) have made it clear that there is a "bright line distinction" between the public enforcement provisions of the CPA and the private cause of action described in C.L. § 13–408. In an action brought by a private party, the claimant may only recover damages for actual injury or loss. In *CitaraManis v. Hallowell*, 328 Md. 142, 613 A.2d 964 (1992), the Court of Appeals explained:

In a public enforcement proceeding '[a]ny practice prohibited by this title is a violation ... whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice.' § 13–302. In contrast, a private enforcement proceeding pursuant to § 13–408(a) expressly only permits a consumer 'to recover for injury or loss sustained by him as the result of a practice prohibited by this title.' § 13–408(a). Section 13–408(a), therefore, requires an aggrieved consumer to establish the nature of the actual injury or loss that he or she has allegedly sustained as a result of the prohibited practice.

*Id.* at 152, 613 A.2d 964; *see also Morris v. Osmose Wood Preserving*, 340 Md. 519, 538 n. 10, 667 A.2d 624 (1995); *Golt v. Phillips*, 308 Md. 1, 12, 517 A.2d 328 (1986)(stating that, "in determining the damages due the consumer, we must look only to his actual loss or injury caused by the unfair or deceptive trade practices").

We focus here on § 13–301 of the CPA. It provides, in pertinent part:

Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading customers;

(2) Representation that:

* * *

(iii) Deteriorated, altered, reconditioned, reclaimed, or secondhand consumer goods are original or new; or

* * *

(3) Failure to state a material fact if the failure deceives or tends to deceive;

* * *

(6) False or misleading representation of fact which concerns:

(i) The reason for or the existence or amount of a price reduction;

* * *

(9) Deception, fraud, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service....

A misrepresentation falls within the scope of C.L. § 13–301(1) if it is "false" or "misleading" *and* it has "the capacity, tendency, or effect of deceiving or misleading" consumers. *See Hartford,* 109 Md.App. at 217, 674 A.2d 106. C.L. § 13–301(2)(iii) prohibits a representation that "[d]eteriorated, altered, reconditioned, reclaimed, or secondhand consumer goods are original or new." C.L. § 13–301(3) proscribes the "[f]ailure to state a material fact if the failure deceives or tends to deceive." C.L. § 13–301(9) makes it illegal to promote the sale of a consumer good using "[d]eception, fraud, false pretense, misrepresentation, or knowing concealment,

suppression, or omission of any material fact with the intent that a consumer rely on the same...." With respect to the fact that the Taurus was a demonstrator vehicle, it is abundantly clear that appellant was neither deceived nor misled, notwithstanding the dealer's indication on the first buyer's order form that the automobile was new.

*Consumer Protection Division v. Luskin's, Inc.*, 120 Md. App. 1, 706 A.2d 102, *cert. granted*, 350 Md. 280, 711 A.2d 871 (1998), is helpful in analyzing C.L. § 13–301. In that case, we reviewed the meaning of an "unfair or deceptive trade practice" under C.L. §§ 13–301(1), (3), and (9). The circuit court had reversed the Division's determination that Luskin's violated the CPA when it advertised "Free Airfare For Two" to various vacation destinations for customers who purchased items from Luskin's. *Id.* at 6, 706 A.2d 102. Before this Court, Luskin's argued that the Division should have applied the test currently used by the Federal Trade Commission ("FTC") in evaluating the meaning of "unfair or deceptive trade practices," because C.L. § 13–105 instructs that "due consideration and weight [must] be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." The FTC has traditionally evaluated allegedly deceptive trade practices using a "total impression" test, in which a representation is "judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context." *Id.* at 27, 706 A.2d 102 (citations omitted).

Prior to 1983, the FTC made this determination from the point of view of an ordinary, unsophisticated consumer. *Id.* In a policy statement delivered to Congress in 1983, the FTC unveiled its intention to evaluate the deceptiveness of trade practices from the point of view of a *reasonable* consumer. The effect of the change was to make it more difficult to prove a "deceptive" trade practice, because the new standard "require[d] not only a representation or omission that is likely to mislead, but also that: (1) the practice is likely to mislead the consumer who is *acting reasonably* in the circumstances; and (2) the representation or omission is material, that is, the

consumer is likely to have chosen differently *but for* the deception." *Id.* at 28, 706 A.2d 102 (emphasis in original).

We concluded that Maryland's standard for evaluating allegedly deceptive trade practices under C.L. § 13–301 differed from the FTC approach, because a line of Maryland cases decided since 1983 was "aligned more closely with federal law on deception as it existed prior to 1983." *Id.* at 29, 706 A.2d 102. The Maryland cases did not employ the "reasonable consumer" standard and the "but for" test. Rather, the cases utilized the more generous "ordinary consumer" test. *Id.* at 29–30, 706 A.2d 102; *see Golt,* 308 Md. at 10, 517 A.2d 328 (stating "An omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action."); *Legg v. Castruccio,* 100 Md.App. 748, 642 A.2d 906 (1994); *State v. Cottman Transmissions Sys. Inc.,* 86 Md.App. 714, 587 A.2d 1190, *cert. denied,* 324 Md. 121, 596 A.2d 627 (1991). Thus, the *Luskin's* Court upheld the determination of the Division, which had applied a "total impression" analysis from the point of view of an ordinary consumer. *Id.* at 31–35, 706 A.2d 102.

We turn to evaluate whether, in the light most favorable to appellant, the dealer was entitled to summary judgment as to appellant's unfair and deceptive trade practices claim.

*A. The Dealer's Representation that the Taurus Was "New"*

Based on the undisputed facts, and even applying the stringent standard established in *Luskin's,* we are amply satisfied that the act of checking the "new" box on the May 25 buyer's order form had absolutely no "capacity, tendency, or effect of deceiving or misleading" appellant. C.L. § 13–301(1). To be sure, the vehicle was not brand new. *See* Md.Code (1977, 1998 Repl.Vol.), § 11–138 of the Transportation Article ("Trans.") (defining a "new vehicle" as one "that has never been used to destroy its newness or to convert it into or make it a used or secondhand vehicle, as these terms are commonly used or understood in trade or business.)"; *see also Wheaton Dodge City, Inc. v. Baltes,* 55 Md.App. 129, 132, 461 A.2d 38

(1983)(observing that " 'new', like 'chaste', is not a *matter of degree*, and once lost may only be referred to thereafter in the comparative sense, never again as an absolute"). Nevertheless, the dealer's description of the Taurus as "new" cannot be viewed in a vacuum.

It is uncontroverted that, at the time of the transaction, appellant was expressly informed that the vehicle had been used as a "demo." Indeed, during his deposition, appellant admitted that Loyola Ford *told* him prior to signing the first buyer's order that it was a demonstrator vehicle. McGraw also knew that the car had been driven 6,161 miles, and the dealer noted the exact mileage on the same form that erroneously described the vehicle as "new." In addition, the first buyer's order form was replaced with a second form a few days later, before the transaction was consummated. On the second form, the dealer correctly described the vehicle as a demo.

Because appellee made a timely disclosure that the vehicle was a demonstrator, and informed appellant of the actual mileage on both buyer's order forms, the act of checking the "new" box on the first form certainly had "no capacity, tendency, or effect of deceiving or misleading" appellant. The dealer's disclosures simply do not support an inference that Loyola Ford "intended that [appellant] rely" on the description of the vehicle as "new", as a way of convincing him that the car was new, because both parties knew that it was not. Stated otherwise, whatever falsity attended appellee's act of checking the box marked "new" on the first buyer's order form, it did not vitiate the dealer's affirmative act of timely disclosing that the vehicle was a demo with over 6000 miles on it.

■ Accordingly, we reject appellant's argument that Loyola Ford violated C.L. § 13–301 by checking the "new" box on the buyer's order form. Appellant's contention flies in the face of logic and the undisputed facts. Indeed, " 'viewing [the representation] as a whole, without emphasizing isolated words or phrases apart from their context,' " *Luskins,* 120

Md.App. at 27, 706 A.2d 102 *(quoting American Home Prods. Corp. v. F.T.C.,* 695 F.2d at 681, 687 (3d Cir.1982)), the description of the vehicle as new, could not have misled appellant.

We also consider appellant's complaint concerning the dealer's alleged misrepresentations about the favorable pricing of the demo as significant in defeating his claim here. McGraw posited factual assertions as to the pricing of the demo that are completely at odds with the claim concerning the description of the vehicle as "new." On the one hand, McGraw contends that he was misled when the dealer described the vehicle as "new," implying that he did not know the vehicle was a demo. Yet he also asserts that the dealer's representations regarding the pricing of the *demo* were actionable. At least implicitly, then, McGraw has acknowledged that he was aware the vehicle was a demo, or else the contention regarding pricing is meaningless. The factual contradiction undermines appellant's claim that he was deceived by the dealer's representation that the vehicle was "new."

■ Moreover, appellant's deposition testimony makes it difficult to perceive how the representation that the vehicle was new could have caused appellant any "injury or loss," as required by C.L. § 13–408(a). As discussed earlier, a failure to "establish the nature of the actual injury or loss that [a consumer] has allegedly sustained as a result of the prohibited practice" is fatal to a private cause of action under the Act. *CitaraManis,* 328 Md. at 152, 613 A.2d 964; *see Hall v. Lovell Regency Homes Ltd. Partnership,* 121 Md.App. 1, 27, 708 A.2d 344, *cert. denied,* 350 Md. 487, 713 A.2d 980 (1998) (holding that homeowners could not recover under the CPA for alleged defects in construction when they could not prove "actual injury or loss by any legally accepted measure of damages").

*B. Representations Concerning the Value of Demonstrator Vehicles*

■ As we noted, appellant complains that the dealer violated the CPA because it asserted that the demonstrator

vehicle was "the most outstanding value" on the lot, and that "[e]very consideration in pricing and/or trade in allowance has been given to reduce the settlement price to its lowest." This claim, too, must fail, because the statements are not actionable representations about the Taurus.

We agree with the trial court's conclusion that these statements amounted to "indefinite generality." Indeed, Loyola's representations were obvious examples of the kind of "puffing" and "sales talk" language that many people have come to expect from car dealers. As we see it, this is the sort of speech that is "offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer, and on which no reasonable [person] would rely." W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* § 109 at 757 (5 th ed.1984). Prosser and Keeton explain:

> There can be no recovery [for deceit], for example, for a statement that the plaintiff is being offered an exceptionally good bargain, that he would be foolish not to take advantage of the offer ... or that a building will withstand earthquakes.

*Id.* at 755–56. (citations omitted).

*Travel Committee, Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 603 A.2d 1301, *cert. denied,* 327 Md. 525, 610 A.2d 797 (1992), is noteworthy. In that case, a travel agency claimed that Pan Am owed it a fiduciary duty based, in part, on language in a marketing agreement between the parties. *Id.* at 179, 603 A.2d 1301. The agreement provided that the airlines would "utilize its best efforts to assist [the travel agency] in the marketing and sale of [the airline's] services." *Id.* at 179–80, 603 A.2d 1301. The travel agency also pointed to statements by an airline executive that the marketing agreement imposed a "fiduciary obligation" on Pam Am and that "Pan Am would treat TCI as [its] 'most favored nation.'" *Id.* at 180, 603 A.2d 1301. We concluded that the executive's bravado was "puffery of no legal consequence." *Id.* at 180, 603 A.2d 1301.

The case of *Wolin v. Zenith Homes, Inc.*, 219 Md. 242, 146 A.2d 197, *cert. denied*, 361 U.S. 831, 80 S.Ct. 81, 4 L.Ed.2d 73 (1959), is also instructive. There, the Court noted that claims by a home builder that the home would be built "according to a plan and specifications in structurally sound condition and free of substantial defects" were insufficiently misleading to allow the buyer to rescind the contract. *Id.* at 246, 146 A.2d 197. The Court stated that "representations as to the soundness and value of the house are normally considered in law to be 'indefinite generalities of exaggeration' which could deceive no rational person and therefore do not amount to 'misrepresentation.'" *Id.* at 247, 146 A.2d 197.

We are also guided by *Milkton v. French*, 159 Md. 126, 150 A. 28 (1930). In that case, a real estate agent led Milkton and his fiancé on a tour of a newly built bungalow in Baltimore City. When the buyers asked the agent "'how the construction was, whether, it was substantial, any leaks in the basement, or anything like that and how the roof would be,'" the agent said: "'[P]erfect, cannot be any better, my boss works fine, does the best work can be done.'" *Id.* at 129, 150 A. 28. The agent also told the couple that the house was "'perfectly well constructed.'" French, the builder of the house, later told Milkton that he was "'perfectly safe on the concrete, roof and everything else of the construction because' French 'had built it himself.'" *Id.* at 130, 150 A. 28. After Milkton purchased the house, he sought to rescind the contract on the ground that the statements were fraudulent. *Id.* at 129, 150 A. 28. The Court of Appeals concluded that none of the alleged misrepresentations was actionable. It explained:

> [T]he use of the term "perfectly safe" in connection with every detail of construction was so extravagant in scope and measure, and so indefinite and elusive in meaning, that the statement would fall within the category of a puff instead of a representation, and the plaintiff, who was an architect of experience, could not have been mislead or influenced....The exaggeration of the statement is so plain that it can not be supposed to have deceived any rational person. Everybody knows a new house, as an old one, is

never perfect in construction, but has the anticipated defects inherent to its period. . . . It is difficult to find these words, when reasonably considered, as capable of being understood by a [person] of average intelligence as a clear and definite representation of any particular fact. . . . They fail, therefore, to mount to a misrepresentation, and are but the indefinite generalities of exaggeration.

*Id.* at 132–33, 150 A. 28 (citations omitted).

The statements at issue were contained in a pre-printed form, suggesting that the dealer was talking about demonstrator vehicles in general, not the Taurus in particular. In our view, the pre-printed language on the buyer's order was, at best, "puffery of no legal consequence." *Travel Committee, Inc.,* 91 Md.App. at 180, 603 A.2d 1301. Therefore, we perceive no error in the trial court's decision granting summary judgment in favor of appellee as to Count I.

## II. Intentional Misrepresentation

We next address appellant's contention that Loyola Ford's representations and omissions were actionable under a theory of common law fraud or intentional misrepresentation. Our discussion is informed by our analysis above, because appellant's common law claim of fraud is based on precisely the same facts that he contends constituted unfair and deceptive trade practices under the CPA.

In *Nails v. S & R,* 334 Md. 398, 639 A.2d 660 (1994), the Court of Appeals summarized the elements of the tort of fraud or deceit. In order to prevail, the plaintiff must prove:

1) that the defendant made a false representation to the plaintiff,

2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth,

3) that the misrepresentation was made for the purpose of defrauding the plaintiff,

4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and

5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Id.* at 415, 639 A.2d 660; *see also VF Corp. v. Wrexham Aviation,* 350 Md. 693, 703, 715 A.2d 188 (1998); *Le Marc's Management Corp. v. Valentin,* 349 Md. 645, 653, 709 A.2d 1222 (1998); *Ellerin v. Fairfax Sav., F.S.B.,* 337 Md. 216, 229–30, 652 A.2d 1117 (1995); *Gross v. Sussex, Inc.,* 332 Md. 247, 257, 630 A.2d 1156 (1993); *Parker v. Columbia Bank,* 91 Md.App. 346, 359, 604 A.2d 521, *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992); *Boyd v. Hickman,* 114 Md.App. 108, 135, 689 A.2d 106, *cert. denied,* 346 Md. 26, 694 A.2d 949 (1997). Moreover, the fraud claim must be proved by clear and convincing evidence. *Wrexham Aviation, supra,* 350 Md. at 704, 715 A.2d 188; *Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 300, 513 A.2d 882 (1986); *Krouse v. Krouse,* 94 Md.App. 369, 378–79, 617 A.2d 1098 (1993); *Weisman v. Connors,* 76 Md.App. 488, 503–504, 547 A.2d 636, *cert. denied,* 314 Md. 497, 551 A.2d 868 (1989).

In reviewing the trial court's decision, we are governed by the principle that an " ' "appellate court will not ordinarily undertake to sustain the [summary] judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had discretion to deny summary judgment." ' " *Boyd v. Hickman, supra,* 114 Md.App. at 136, 689 A.2d 106 (quoting *Three Garden Village Ltd. Partnership v. USF & G,* 318 Md. 98, 107–108, 567 A.2d 85 (1989)(quoting *Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988))). In this case, however, there is no written opinion explaining the court's ruling, and the transcript of the hearing does not precisely elucidate the basis for the court's ruling as to the fraud count. Based on the court's comments, however, it appears that the court granted summary judgment as to fraud because appellant was not misled by Loyola Ford's representations. The following colloquy is relevant:

THE COURT: [L]et's assume it's a fact that there was the word new used, which of your counts is made viable by that fact and what relief does that count seek for, by reason of that fact?

APPELLANT'S COUNSEL: Well, I think that's part of the misrepresentation, both counts one and counts—

THE COURT: See, that's where we part company, *because I don't see it as a misrepresentation. It clearly wasn't a misrepresentation because he wasn't misled by it—*

APPELLANT'S COUNSEL: Well, that's—

THE COURT: You'll concede that.

APPELLANT'S COUNSEL: When I say misrepresentation, I mean the whole, there is a whole—

THE COURT: That's just one of the elements. I understand all of the elements, five of them, *but you don't have any of them applicable in this scenario.* What you have is another example of a violation of a reg or statute by the Defendant for which there may not be a remedy beyond a criminal penalty so I once again, I say to you, that I am perfectly willing to listen, to hear a motion to reconsider which has as its purpose a targeted proposal as to why I'm wrong on the relief point in making a recommendation as to relief. I'm not unsympathetic to it, but I have a habit of trying to follow the law in trying to fashion remedies because I'm not here as a legislator.

(Emphasis added).

 We perceive no error. As we discussed earlier, appellant's own deposition testimony unequivocally established that Loyola Ford told him the Taurus was a demonstrator vehicle. Moreover, appellant acknowledged that he read the buyer's order form before he signed it. Therefore, he knew, before entering into any legal obligation to purchase the car, that the Taurus already had 6,161 miles on it. Consequently, even if Loyola Ford intentionally checked the "new" box on the buyer's order, the undisputed evidence demonstrated that appellant could not have been misled by the representation. Absent reliance, appellant cannot prevail on his fraud claim. *See Gross v. Sussex,* 332 Md. at 257, 630 A.2d 1156.

*Hill v. John Banks Buick, Inc.*, 875 S.W.2d 667 (Ct.App. Tenn.1993), provides a useful contrast. In that case, a woman inquired about what seemed to be a new 1989 Buick Regal parked on the lot of a car dealership. A window sticker on the vehicle identified the car as a "demo." After test driving the automobile, the woman decided to buy it. During the course of completing the transaction, she signed three blank "registration or odometer readings," but she had not observed the actual mileage on the vehicle. During negotiations, a salesman advised her that the car was a demonstrator, and had been used to take customers on test drives. No one specifically told her that the car had actually been driven 9,385 miles, however. The salesman also described the vehicle as a "new" car. *Id.* at 669. The customer asked the dealer to "come down" in its price, "since it was a demo and it did have some miles on it." *Id.* She also signed a retail installment sales contract that identified the car as a "demo." Further, when the dealership titled the vehicle, it labeled the car as a "used" car. The customer sued the dealership alleging, *inter alia,* intentional misrepresentation. At the close of the plaintiff's case, the trial court directed a verdict in favor of the dealership, *id.* at 668, and the Tennessee Court of Appeals affirmed. In its view, the fact that the customer knew the car was a demonstration vehicle defeated her claim that the dealership misrepresented the car as "new." *Id.* at 670.

In the case *sub judice,* appellant knew much more about the vehicle than the customer in *Hill* knew about the vehicle she purchased. McGraw was informed that the car was a demonstrator vehicle, and he knew it had been driven 6,161 miles at the time he signed the first buyer's order. In light of the specific knowledge appellant had about the extent of the vehicle's mileage, the dealer's appellation of "new" was of no legal consequence in connection with the fraud claim.

## III. Usury

We turn to consider appellant's contentions that Loyola Ford's financing contract was usurious, in violation of the

RISA. Appellant claims Loyola Ford violated C.L. § 12–609 in two respects. First, appellant argues that, pursuant to C.L. § 12–609(a)(1), the 16.75% interest rate on appellant's financing contract exceeded the 16.5% maximum rate allowed for a "new motor vehicle." Second, McGraw asserted in the usury count of his Second Amended Complaint that Loyola Ford violated C.L. § 12–609(g), because the dealer "failed to disclose in the retail installment contract that [Loyola Ford] was receiving a portion of the finance charge from the assignment of the retail installment contract." [7] At the summary judgment hearing, the trial court concluded that C.L. § 12–609(f) governed the financing aspect of the transaction, rather than C.L. § 12–609(a). Because C.L. § 12–609(f) authorizes an interest rate as high as 24%, the dealer did not violate the RISA by charging an interest rate of 16.75%. The court also concluded that even if Loyola Ford violated C.L. § 12–609(g) by failing to disclose the profit it made on the assignment of appellant's retail installment contract to Chrysler Credit, C.L. § 12–609(g) does not provide a private civil remedy for the violation.

### A. Was The 16.75% Interest Rate Usurious?

Whether the interest rate for the financing of the vehicle violated the RISA depends on whether C.L. § 12–609(a) or C.L. § 12–609(f) applies here. C.L. § 12–609(a) states:

> (a) *Maximum finance charge.*—The finance charge imposed on the sale of a motor vehicle may not exceed an amount computed using the following annual simple interest rates of finance charge:

---

7. As we mentioned earlier, appellant's brief presents the "secret profit" argument in connection with his claims under the CPA and with respect to the claim for intentional misrepresentation, even though it was only raised as part of the usury count in the Second Amended Complaint. In contrast, appellant has omitted the "secret profit" argument from the usury discussion in his brief. We shall address appellant's C.L. § 12–609(g) argument here, to conform with the way the matter was pled in the complaint.

(1) Class 1: A new motor vehicle—16.5 percent on the outstanding balance;

(2) Class 2: A used motor vehicle designated by the manufacturer by a model year not more than two years before the year in which the sale is made—22 percent on the outstanding balance; and

(3) Class 3: A used motor vehicle designated by the manufacturer by a model year more than two years before the year in which the sale is made—27 percent on the outstanding balance.

On the other hand, C.L. § 12–609(f) provides:

(f) *Maximum finance charge.*—Notwithstanding subsection (a) of this section, the finance charge imposed on a motor vehicle sold under a contract may not exceed the following annual simple interest rates of finance charge:

(1) Class 1: A new motor vehicle—24 percent on the outstanding balance;

(2) Class 2: A used motor vehicle designated by the manufacturer by a model year not more than 2 years before the year in which the sale is made—24 percent on the outstanding balance.

Apart from the financing rates prescribed, sections (a) and (f) of C.L. § 12–609 differ in two other respects. First, section (a) governs the "finance charge imposed *on the sale of a motor vehicle*," whereas section (f) addresses "the finance charge imposed *on a motor vehicle sold under a contract.*" (Emphasis added). Second, section (a) limits the "*amount*" of the finance charge "*computed using the following annual interest rates of finance charge,*" whereas section (f) simply limits "*the annual simple interest rates of finance charge.*" Appellant seizes on these semantic differences, essentially proposing that (a) and (f) are not irreconcilable; rather, he urges that they "focus on different aspects of the law of usury."

Appellant asserts that C.L. § 12–609(f), which authorizes a 24% interest rate, applies only when a vehicle is "sold under contract," which appellant interprets to mean a financing

contract. On the other hand, he suggests that C.L. § 12–609(a), which sets a maximum interest rate of 16.5%, applies "in the situation where the finance charge is imposed—not by contract, but on the 'sale of a motor vehicle.'" Here, the May 25 buyer's order, which appellant claims was the "document constituting the contract of sale," did not include any financing terms. It simply obligated appellant to pay an outstanding balance of $30,115.00. Appellant did not sign the retail installment sales contract until May 26, 1995. Moreover, the May 25 buyer's order stated explicitly that "no credit has been extended to [appellant] for the purchase of [the Taurus] except as appears in writing on the face of this agreement." Therefore, as appellant interprets C.L. § 12–609(a), appellee could charge no more than 16.5% as a finance charge.[8]

McGraw's argument, which is somewhat convoluted, is rooted in the slight difference in wording of sections C.L. § 12–609(a) and (f). Appellant interprets section (a) to apply to the "maximum 'amount' of 'finance charge' calculated by using a maximum rate of interest." He urges that C.L. § 12–609(f) "pertains only to the 'rate' of interest of the finance charge, not the amount...." In appellant's view, "[t]he legislature obviously intended the two provisions to focus on different aspects of the law of usury and employed different means to accomplish different ends, i.e. limiting both the 'amount' and the 'rate.'"

In his reply brief, appellant sheds some light on his contention; he suggests a public policy rationale for distinguishing the provisions in the way he suggests. He posits that C.L. § 12–609(a) was meant to protect a buyer who is put in the "vulnerable position" of owing the entire amount due under a contract of sale, yet has no provision for financing. In that circumstance, he claims that the maximum interest rate is statutorily limited to 16.5%, to protect such a buyer from "the

---

8. Presumably, if appellant had entered an agreement on May 25 that simultaneously obligated appellant to purchase the car and provided financing terms, appellee could have charged 24%, pursuant to C.L. § 12–609(f).

economic squeeze" of an "exorbitant interest rate." Under appellant's construction of the RISA, C.L. § 12–609(a) limits "the greed of the credit providers to 16.5% where the buyer has been placed in a vulnerable position."

Appellee, on the other hand, relies on a strict and literal statutory interpretation. The dealer claims that C.L. § 12–609(f) effectively overrides section (a) by the use of the phrase "[n]otwithstanding subsection (a) of this section." Accordingly, appellee argues that the sale of the Taurus was governed by C.L. § 12–609(f).

As we see it, the only substantive difference between C.L. § 12–609(a) and C.L. § 12–609(f) is the schedule of maximum rates permitted on contracts for the purchase of automobiles. We can discern no appreciable difference between the "amount" of financing charge limited in section (a) and the "rate" of financing charge restricted in section (f), particularly when both are expressed in terms of a percentage of the outstanding balance. In our view, the use of the words "under a contract" in section (f) is too thin a reed upon which to construct an alternate purpose for section (f). Section (a), which addresses the finance charge for the "sale" of a vehicle, obviously embodies a sale pursuant to a contract, be it oral or written. Even if, *arguendo*, the Legislature meant to distinguish the contract for the sale of a motor vehicle from a separate financing contract for the same vehicle, the words "sold under a contract" in section (f), governing financing agreements, would not add significant meaning to the provision already found in section (a), as both types of agreements are "contracts." Stated otherwise, there is nothing in the text of section (f) to indicate that "sold under a contract" only means sold under a *financing* contract.

██ Appellant's argument that sections (a) and (f) control different kinds of contracts for the sale of automobiles is not supported either by the principles of statutory construction or the legislative history. To the contrary, applying well settled principles of statutory construction, in conjunction with our review of the legislative history, we are satisfied that C.L.

§ 12–609(f) governs here. Because the rates in section (f) conflict with the rates in section (a), and section (f) was enacted *after* section (a), we conclude that the Legislature repealed by implication the rates provided in section (a). We explain further.

The legislative history reveals that the General Assembly intended to increase the maximum interest rate from 16.5% to 24%, by adding what is now C.L. § 12–609(f) in 1980, and later removing a sunset provision in 1985. Moreover, the Legislature's use in C.L. § 12–609(f) of the phrase "notwithstanding subsection (a) of this section" denotes a recognition by the Legislature of the conflict between sections (f) and (a), and evidences the Legislature's intention that section (f) take precedence over section (a).

 The cardinal rule in statutory construction is to determine and effect the intent of the Legislature. *Roberts v. Total Health Care, Inc.,* 349 Md. 499, 523, 709 A.2d 142 (1998); *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995); *Mayor of Baltimore v. Cassidy,* 338 Md. 88, 656 A.2d 757 (1995); *Privette v. State,* 320 Md. 738, 744, 580 A.2d 188 (1990). The statute itself is the primary source for determining the Legislature's intent. *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 570, 709 A.2d 749 (1998); *Allied Vending Inc. v. City of Bowie,* 332 Md. 279, 306, 631 A.2d 77 (1993); *State v. Patrick A.,* 312 Md. 482, 487, 540 A.2d 810 (1988); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988). To ascertain the legislative intent, "the Court considers the language of an enactment and gives that language its natural and ordinary meaning." *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994); *see Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998); *Chesapeake and Potomac Tel. Co. v. Dir. of Fin.,* 343 Md. 567, 578, 683 A.2d 512 (1996); *Carroll County Ethics Commission v. Lennon,* 119 Md.App. 49, 67, 703 A.2d 1338 (1998); *Dept. of Econ. and Employment Dev. v. Taylor,* 108 Md.App. 250, 267, 671 A.2d 523 (1996), *aff'd,* 344 Md. 687, 690 A.2d 508 (1997). As the Court said in *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946 (1993) (internal citations

omitted), "Giving the words their ordinary and common meaning 'in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence,' normally will result in the discovery of the Legislature's intent."

Further, when analyzing a statute, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994); *see also State v. Thompson,* 332 Md. 1, 7–8, 629 A.2d 731 (1993) (courts must reach a statutory interpretation compatible with common sense). Moreover, a statute should be read so that no word, sentence, or section is rendered surplusage, superfluous, meaningless, or nugatory, unless a contrary result is manifest in the legislative intent. *Gordon Family Partnership v. Gar On Jer,* 348 Md. 129, 138, 702 A.2d 753 (1997); *Buckman,* 333 Md. at 523–24, 636 A.2d 448; *State v. 149 Slot Machines,* 310 Md. 356, 361, 529 A.2d 817 (1987); *Board of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185 (1982).

The plain meaning of the word "notwithstanding" is "without prevention or obstruction from or by; in spite of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1545 (2 nd ed.1976); see *First Union Mortgage Corp. v. Eubanks (In re Eubanks),* 219 B.R. 468, 470 (B.A.P. 6 th Cir.1998)(holding that use of the phrase "notwithstanding subsection (b)(2)" in a provision of the Bankruptcy Reform Act of 1994 " 'clearly signal[ed] the drafter's intention that the provisions of the "notwithstanding" section override conflicting provisions of any other section.' " (citations omitted)); *see also King v. Sununu,* 126 N.H. 302, 490 A.2d 796, 800 (N.H. 1985); *City of Seattle v. Ballsmider,* 71 Wash.App. 159, 856 P.2d 1113, 1115 (Wash.Ct.App.1993); *Williamson v. Schmid,* 237 Ga. 630, 229 S.E.2d 400, 402 (Ga.1976). The Attorney General, interpreting the term "notwithstanding," has said:

> The term "notwithstanding" generally means "without prevention or obstruction from or by, or in spite of," the provisions of law listed after the word "notwithstanding."

Thus, ordinarily, only the provisions after the word "notwithstanding" are to be disregarded when considering the statute in which the "notwithstanding" clause appears.

96 Op. Att'y Gen. 34 (1996) (citations omitted).

 In reconciling sections (f) and (a), we are also mindful that a repeal may be found when a subsequent provision is irreconcilable with an earlier one. Yet we are also aware of the "fundamental principle that the law does not favor repeals by implication." *Department of Nat. Res. v. France,* 277 Md. 432, 460, 357 A.2d 78 (1976). Ordinarily, "a repeal by implication does not occur unless the language of the later statute plainly shows that the legislature intended to repeal the earlier statute," in most cases by use of an "express reference" to the previous enactment. *State v. Harris,* 327 Md. 32, 39, 607 A.2d 552 (1992). "Because the General Assembly is presumed to have intended that all its enactments operate together as a consistent and harmonious body of law, statutes will be interpreted, whenever reasonably possible, to avoid repeal by implication." *Farmers & Merchants Nat. Bank of Hagerstown v. Schlossberg,* 306 Md. 48, 61, 507 A.2d 172 (1986). As the Court said in *Schlossberg,* however, "the same presumed legislative intent" that leads the court to interpret all of the legislature's pronouncements as a "consistent and harmonious" whole requires that "[i]f two statutes contain an irreconcilable conflict, . . . the statute whose relevant substantive provisions were enacted most recently [should] be held to have repealed by implication any conflicting provisions of the earlier statute." *Schlossberg,* 306 Md. at 61, 507 A.2d 172; *see Gannon & Son v. Emerson,* 291 Md. 443, 455, 435 A.2d 449 (1981)(stating that "[r]epeals which are not express will not be found 'unless demanded by irreconcilability or repugnancy' ") (quoting *City of Bowie v. Washington Suburban Sanitary Commission,* 249 Md. 611, 618, 241 A.2d 396 (1968)).

The current version of C.L. § 12–609(a) was originally enacted in 1954, by 1954 Md. Laws, Chap.80.[9] The purpose statement of the act provided, in part:

AN ACT, to add a new section to Article 83 of the Annotated Code of Maryland (1951 Edition), title [sic] "Sales and Notices,"... fixing the maximum rates which may be charged *in retail installment sales of motor vehicles,* and limiting the insurance coverage which may be included under such contracts and also providing penalties for overcharges.

(Emphasis added).

The text of the 1954 law provided:

(b) The finance charge imposed on the sale of a motor vehicle shall not exceed the following rates:

Class 1. Any new motor vehicle—$9 per $100 per year on the principal balance.

Class 2. Any used motor vehicle designated by the manufacturer by a year model not more than two years prior to the year in which the sale is made—$12 per $100 per year on the principal balance.

Class 3. Any used motor vehicle designated by the manufacturer by a year model more than two years prior to the year in which the sale price is made—$15 per $100 per year on the principal balance.

In 1980, the Legislature amended C.L. § 12–609(a), replacing the dollars-per-$100 formula with a statement expressing the limit in terms of an annual simple interest rate.[10] The amended provision provided:

---

**9.** The 1954 law was codified at Md.Code, art. 83 § 119A. Later, it was transferred to art. 83, § 132. In 1975, the provision was codified in the new Commercial Law Article, at § 12–609(a). *See* 1975 Md. Laws, Chap. 49.

**10.** A "Revisor's Note" to the 1975 law creating C.L. § 12–609(a) explained:

"Although the listing of rates by dollars per $100, rather than in percentages, is somewhat archaic, the Commission has retained this style to avoid losing the emphasis that the rates expressed in the section are 'add-on' rates." (Cf. *Falcone v. Palmer Ford, Inc.,* 242

(a) The finance charge imposed on the sale of a motor vehicle may not exceed an amount computed using the following annual simple interest rates of finance charge:

(1) Class 1: A new motor vehicle—16.5 percent on the outstanding balance;

(2) Class 2: · A used motor vehicle designated by the manufacturer by a model year not more than two years before the year in which the sale is made—22 percent on the outstanding balance;

(3) Class 3: A used motor vehicle designated by the manufacturer by a model year more than two years before the year in which the sale is made—27 percent on the outstanding balance.

180 Md. Laws, Chap. 386.

Later that term, the Legislature passed HB 1414, creating what is now C.L. § 12–609(f). 1980 Md. Laws, Chap. 866. The new provision was enacted "*[f]or the purpose of ...* *increasing the rate of finance charge permitted in connection* *with the sale of certain motor vehicles....* " *Id.* C.L. § 12–609(f), then located at C.L. § 12–609(e), contained a sunset provision providing for the section's demise on August 1, 1982. The law stated:

(e) Notwithstanding subsection (a) of this section, the finance charge imposed on a motor vehicle sold under a contract *executed before August 1, 1982,* may not exceed the following annual simple interest rates of finance charge:

(1) Class 1: A new motor vehicle—21. 5 percent on the outstanding balance; and

(2) Class 2: A used motor vehicle designated by the manufacturer by a model year not more than 2 years before·

---

Md. 487, 219 A.2d 808 (1966).) The Commission notes, however, the absences in this section of express provisions to this effect, such as that contained in § 12–611(a)(1), as well as any provisions for pro rata adjustments, such as those contained in § 12–611(a)(2) and (3). 1975 Md. Laws, Chap.49 at 485. Commission Report No. 1975–1 to the General Assembly of Maryland suggested that "[c]larifying legislation" in this regard "may be appropriate." *Id.* at 24.

the year in which the sale is made—23.5 percent on the outstanding balance.

(Emphasis added).

Our review of the bill files and committee reports associated with HB 1414 convinces us that what is now section (f) was enacted in direct response to the exorbitant interest rates for consumer loans that prevailed in 1980. The new law constituted an effort to make credit available to consumers who would otherwise have been foreclosed completely from the new car market. A letter from the Automobile Trade Association of Maryland in support of the bill summarized the problem:

> At the present time credit unions are not making automobile loans. Banks are only making loans on a very selective basis to customers of the bank. The only real source available to an automobile dealer to buy his retail installment agreements are the Ford Motor Credit Company, Chrysler Credit Company and General Motors Acceptance Corporation. Even these sources are becoming selective and requiring re-purchase or recourse agreements.

> As long as the prime rate is 19% or higher there is no reason for a bank to take an assignment of a retail installment agreement for 16%.

The bill file also contains a summary of HB 1414 that is helpful in ascertaining its relationship to the rates described in C.L. § 12–609(a). The summary states that HB 1414 "INCREASES FINANCE CHARGE CEILING ON SALES OF NEW AND TWO YEAR OLD MOTOR VEHICLES. NEW VEHICLE—PRESENTLY 16.5%, WITH HOUSE BILL 1414—21.5%. USED VEHICLE LESS THAN TWO MODEL YEARS OLD PRESENTLY 22%[,] WITH HOUSE BILL 1414—23.5 PERCENT."

A letter from then Attorney General Stephen H. Sachs to Governor Harry Hughes found "no substantial objection to [the] constitutionality and legal sufficiency" of the bill. In a footnote, the Attorney General indicated his interpretation of the effect of HB 1414:

&ast; &ast; &ast; H.B. 1414, like H.B. 410 permits increase in the finance charge imposed in connection with certain motor vehicle sales....H.B. 1414 adds new subsection 12–609(e), which sets forth *new permissible rates* for certain sales "notwithstanding Subsection (A) of this Section."

(Emphasis added).

As we noted, a sunset provision was to take effect on August 1, 1982, with regard to C.L. § 12–609(f). In 1982, however, the Legislature extended the sunset provision to July 1, 1985, and increased the rate to 24% on both classes of vehicles covered by C.L. § 12–609(f). 1982 Md. Laws, Chap. 753. In 1985, by 1985 Md. Laws, Chap. 150, the Legislature eliminated the sunset provision altogether. That law, before the Senate as SB 201, addressed nine separate provisions of the Commercial Law and Financial Institutions articles, and was "[f]or the purpose of continuing the existence of certain ceilings on certain maximum finance charges by repealing the termination provisions on those ceilings...." Again, the bill file is particularly helpful in illuminating the Legislature's intent.

At the time the General Assembly considered SB 201, the consumer credit landscape was uncertain. Most of the ceilings affected by the proposed law were put in place in 1982, with sunset provisions of July 1, 1985. *See* 1982 Md. Laws, Chap. 1853. Meanwhile, in 1983, the Legislature had enacted the "Credit Deregulation Act of 1983." The Deregulation Act was optional; lenders could choose to operate under its relaxed consumer protection provisions, or they could continue to offer credit under the former rates, which were subject to sunset provisions. 1983 Md. Laws, Chap. 143. Thus, in 1985, the General Assembly faced the question of whether to allow the higher rates to expire on the sunset date, or to remove the sunset provisions, making the higher rates permanent. *See* Letter from Alan Thomas Fell, Commission of Consumer Credit, to F. Carvel Payne, Director, Department of Legislative Reference (December 7, 1984).

The Hearing Bill Summary for SB 201 made clear that in removing the sunset provision in C.L. § 12–609(f), the Legislature intended to enshrine at 24% the financing rate for new cars and used cars less than two years old. The Summary stated:

> *Summary:* In 1982, the General Assembly created a three year period where the ceiling rates of interest for the credit provisions of the Commercial Law Article 12 would be suspended and a temporary ceiling rate of 24% allowed. *This bill makes the 24% interest rate ceiling permanent* and removes from the article the earlier lower interest rate ceilings.

(Emphasis added). With regard to C.L. § 12–609, the summary stated that the "Old Ceiling" for new cars and used cars less than two years old was 16.5%; the "Temporary and Permanent New Ceiling" was 24%.

In a letter from John Berry, Senate Finance Committee Analyst, to Senator Dennis F. Rassmussen, Chair of the Senate Finance Committee, Berry described C.L. § 12–609 in his "Summary of Affected Sections:"

> 6. 12–609 *loans for motor vehicles now have a cap of 24% for all cars except a used car more than 2 years old* which has a 27% rate. If sunsetted, the 27% rate for 2 years + old cars remains unaffected. The rate for a new motor vehicle *becomes* 16.5% and the rate for a used car less than 2 years old is limited to 22%.

(Emphasis added).

The foregoing excursus into legislative archaeology sheds light on the background of the phrase "notwithstanding subsection (a) of this section." At the time the phrase was first employed, it indicated that section (f) took precedence over C.L. § 12–609(a)(1) and (2), but only on a temporary basis, and it left C.L. § 12–609(a)(3) unaffected. The ceiling on used automobiles "designated by the manufacturer by a model year more than two years before the year in which the sale is made" remained at 27%. In 1985, however, the General Assembly made permanent what had been provisional.

The legislative history contains no mention of the problem of "vulnerable" consumers being exposed to "exorbitant" interest rates because they had signed a contract but had not yet arranged financing. If that problem had been the impetus for enacting sections (a) and (f) as separate provisions, we would expect to find at least some discussion or reference to the consumer protection problem.

In our view, the legislative history, in concert with our interpretation of the plain meaning of the text of C.L. § 12–609(f), compels the conclusion that, as to the sale of new cars and cars less than 2 years old, C.L. § 12–609(a) was repealed by implication. Accordingly, we perceive no error in the court's conclusion that, pursuant to C.L. § 12–609(f), Loyola Ford was permitted to finance appellant's vehicle at the rate charged.

## B. Loyola's Financing Profit

Count II of appellant's complaint, as amended, alleges that Loyola Ford violated C.L. § 12–609(g), because the dealer failed to disclose to appellant that it had obtained financing from Chrysler Credit at 9.85%, and assigned the retail installment contract to Chrysler Credit, retaining for itself the excess financing charge. Appellant estimates, based on a document produced by Loyola Ford, that the dealer profited by $4,780.00 on the financing arrangement. McGraw also complains that Loyola Ford hid its "secret profit" throughout the litigation.

C.L. § 12–609(g) provides:

(g) *Assignment by seller of retail installment agreement.*
—— A seller may assign a retail installment agreement and receive a portion of the finance charge only if the fact is disclosed in the agreement. The specific amount to be received need not be disclosed.

Section 12–630 of the Commercial Law article defines the remedies that are available for violations of the Retail Installment Sales Act, codified at C.L. §§ 12–601 through 12–631. C.L. § 12–630 provides, in pertinent part:

(a) *Holder not to collect charges.*—Except as provided by subsections (b) and (c) of this section, a holder may not collect or receive any finance, delinquency, or collection charge from the buyer if:

(1) The agreement does not contain the information required by §§ 12–604 through 12–606 of this subtitle;

(2) The seller fails to deliver to the buyer a required copy of the agreement; or

(3) The agreement contains a finance charge in excess of the applicable charge permitted by §§ 12–609 or 12–610 of this subtitle.

Appellee contends that C.L. § 12–630 precludes a civil remedy for a violation of § 12–609(g). First, appellee claims that C.L. § 12–630 provides a remedy only for violations by "holders" of a retail installment sales contract, and it contends that it is not a holder under C.L. § 12–601(*l*).[11] Second, appellee argues that C.L. § 12–630(a)(3) authorizes a civil remedy only for a finance charge in excess of the rates defined in C.L. § 12–609 or C.L. 12–610. Because the disclosure requirement in C.L. § 12–609(g) has nothing to do with the overall rate of the finance charge, appellee contends that C.L. § 12–630 provides no remedy. Appellant responds, however, that C.L. § 12–609(g) is impliedly within the purview of C.L. § 12–630, because the provision is found in a section titled "Maximum Charge on Vehicles."

On June 27, 1997, Loyola Ford gave the following answer to an interrogatory propounded by appellant:

*Interrogatory No. 28:* If this Defendant does not contend that it received no other credits, bonuses, or any other funds from the Seller from whom it purchased the Taurus and that $25,919.10 was the final and actual amount paid by it for the Taurus, list and describe all bonuses, other funds and credits received by t3his [sic] Defendant from: 1) the

---

**11.** The Retail Installment Sales subtitle defines a "holder" in C.L. § 12–601(*l*) as "a person, *including a seller* and a sales finance company, entitled to enforce an agreement against a buyer."

sale of the Taurus to the Plaintiff and, 2) the purchase of the Taurus by the Defendant from its supplier.

*Answer:* Defendant objects to this Interrogatory on the ground that it is ambiguous and confusing. Notwithstanding this objection and without waiving said objection, *Defendant responds that it did not receive any bonuses, credits or other funds as a result of the sale of the Taurus to the Plaintiffs.*

(Emphasis added).

At the summary judgment hearing, the court expressed concern that appellee had been less than forthright in its answer to appellant's interrogatory. Appellee defended its answer by contending that the question asked whether Loyola Ford had profited from the sale, not whether it profited from the financing of the Taurus. Characterizing appellee's response as a "discovery violation," the court invited appellant to file a post-judgment motion articulating a theory by which the court could impose a "creative penalty" for Loyola Ford's response to appellant's interrogatory. Nevertheless, the court agreed with appellee that even if Loyola Ford violated the RISA, summary judgment was proper because, as a matter of law, no civil remedy was available to appellant for a violation of the relevant statutory provision.

Our review of the record reveals an important threshold issue, which was not presented or considered below, but which may be dispositive of this particular claim.

The retail installment sales contract, dated May 26, 1995, was signed by appellant. It contains the following language: "This contract is accepted by the creditor (seller) and assigned to Chrysler Credit Corporation in accordance with the terms of the assignment set forth on the reverse hereof." Further, the words "Chrysler Credit Corporation" are printed, in large type, at the top of the page. On the reverse side of the document, a lengthy paragraph entitled "Assignment" provides, in part:

> ON VALUE RECEIVED the Creditor (Seller) named on the face of this contract ("Seller") hereby sells, assigns and

transfers to Chrysler Credit Corporation ("Chrysler") Seller's entire right, title and interest in and to this contract and authorizes Chrysler to do every act and thing necessary to collect and discharge obligations arising out of or incident to this contract and assignment.

The question of whether the contract language was sufficient to satisfy the requirements of C.L. § 12–609(g) was not addressed or considered at the hearing. In arguing the matter before the court, appellee's counsel merely said: "[I]f there was a violation, *and I do not agree that there was—*" (Emphasis added).

We do not know why appellee did not raise the issue of statutory compliance, but we do know that the dealer did not have much time to develop its legal and factual arguments. As we observed earlier, appellant first added this RISA claim on October 7, 1997. By then, appellee's summary judgment motion was already pending. The dealer promptly moved to strike the claim as untimely filed, and the motion to strike was pending when summary judgment was considered. Moreover, on October 16, 1997, a few days after the new RISA claim was filed, and shortly before the summary judgment hearing of October 27, 1997, appellee endeavored to address the new RISA claim in a "reply" memorandum, filed in support of its motion for summary judgment. In that memorandum, appellee merely contended that the RISA did not provide a private remedy for a violation of C.L. § 12–609(g). Although appellee did not admit that it violated the statute, neither did it contend that it had complied with the Act.

In our review of the grant of summary judgment, we ordinarily will uphold the trial judge only on the grounds relied upon by the judge. *Boyd v. Hickman,* 114 Md.App. at 136, 689 A.2d 106. At the time of the summary judgment hearing, given the posture of the case, the terms of the actual retail installment agreement were unexplored. Because the question of whether the agreement complied with the RISA is potentially dispositive, we shall neither affirm nor reverse the court's entry of summary judgment with respect to this por-

tion of Count II. Instead, we shall remand to the trial court for a determination of whether summary judgment is appropriate under C.L. § 12–609(g). See Md. Rule 8–604(d).

APPELLEE'S MOTION FOR SANCTIONS DENIED; SUMMARY JUDGMENT IN FAVOR OF APPELLEE AS TO COUNT II VACATED, IN PART, AS TO CLAIM BASED ON C.L. § 12–609(g); THAT CLAIM IS REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL OTHER JUDGMENTS IN FAVOR OF APPELLEE AFFIRMED. COSTS TO BE PAID 90% BY APPELLANT, 10% BY APPELLEE.