**PARK RISE HOMEOWNERS ASSOCIATION, INC., a Colorado non-profit corporation, Plaintiff–Appellant,**

v.

**RESOURCE CONSTRUCTION COMPANY, a Colorado corporation, Defendant–Appellee.**

No. 04CA0091.

Colorado Court of Appeals, Div. V.

June 15, 2006.

**428**

Benson & Associates, P.C., Jesse Howard Witt, Golden, Colorado, for Plaintiff–Appellant.

Fowler, Schimberg & Flanagan, P.C., Daniel M. Fowler, Katherine T. Eubank, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge WEBB.

In this construction defects case, plaintiff, Park Rise Homeowners Association, Inc. (the HOA), appeals the judgment entered on a directed verdict in favor of defendant, Resource Construction Company (Resource). We affirm in part, reverse in part, and remand for further proceedings.

The HOA is the homeowners association for a condominium community where Resource acted as the general contractor during much of the construction. The HOA filed this action against both Resource and the developer of the community, Park Rise, LLC (the Developer), alleging property damage from defects throughout the community. The HOA brought claims of negligence, negligence per se, and violation of the Colorado Consumer Protection Act, § 6–1–101, et seq., C.R.S.2005 (CCPA).

Shortly before trial, the HOA settled with the Developer. The trial court ruled that the jury could apportion fault to the Developer as a designated nonparty. The case proceeded to trial with the HOA presenting expert testimony on numerous defects throughout the community. When the HOA rested, the court directed a verdict for Resource based on the economic loss rule; insufficient evidence apportioning damages between faulty construction and design defects for which Resource was not responsible; and failure to prove a deceptive trade practice.

In its ruling, the court treated the HOA as a third-party beneficiary of the construction contract between the Developer and Resource. Thereafter, the court allowed the HOA to amend the complaint to conform to the evidence by adding a breach of contract claim. Nevertheless, the court concluded that the failure to apportion damages was equally fatal to this claim.

At oral argument, counsel to the HOA stated that, if its negligence claims were reinstated, it would not proceed on the breach of contract claim. Hence, we will not separately analyze that claim.

## I. Economic Loss Rule

The HOA first contends the trial court erred in dismissing its negligence claims under the economic loss rule. We agree.

The trial court dismissed both the negligence claim and the negligence per se claim on this basis. Resource does not defend dismissal of the negligence per se claim on any other ground. Thus, while a negligence per se claim involves different elements from a negligence claim, we address only the trial court's error in dismissing both claims under the economic loss rule.

### A. General Contractor's Duty

■ The existence and scope of a tort duty is a question of law to be determined by the court. *Cary v. United of Omaha Life Ins. Co.,* 68 P.3d 462 (Colo.2003).

When the trial court ruled, it did not have the benefit of the supreme court's decision in *A.C. Excavating v. Yacht Club II Homeowners Ass'n,* 114 P.3d 862 (Colo.2005), which we consider to be dispositive.

In *A.C. Excavating, supra,* as here, the plaintiff was a homeowners association, representing individual unit owners, and seeking purely economic damages for construction defects. The defendant was a subcontractor who had not dealt directly with any of the individual unit owners.

The supreme court concluded that "the Association's negligence action is not barred by the economic loss rule." *A.C. Excavating, supra,* 114 P.3d at 865. In so holding, the court explained that *Cosmopolitan Homes, Inc. v. Weller,* 663 P.2d 1041 (Colo.1983), and *Town of Alma v. Azco Construction, Inc.,* 10 P.3d 1256 (Colo.2000), both "recognize that builders are under an independent duty of care to construct homes without negligence." *A.C. Excavating, supra,* 114 P.3d at 865.

Contrary to Resource's arguments before us, the court interpreted *Cosmopolitan Homes, supra,* as "suggest[ing] that this

duty is broadly shared by builders in general." *A.C. Excavating, supra,* 114 P.3d at 868. The court also observed that, in applying the factors articulated in *Taco Bell, Inc. v. Lannon,* 744 P.2d 43 (Colo.1987), for determining the existence of a duty of care concerning "work performed by general contractors as opposed to subcontractors, we do not see how they could create an independent tort duty upon the former group of builders, but not the latter." *A.C. Excavating, supra,* 114 P.3d at 868.

■ This expansive language leaves no doubt that general contractors, such as Resource, "and other builders are under an independent tort duty to act without negligence in the construction of homes." *A.C. Excavating, supra,* 114 P.3d at 868.

### B. Latent Defects

Nor are we persuaded by Resource's argument that the trial court could have properly dismissed the negligence claims because experts for the HOA did not apportion damages between latent and patent defects.

■ Under *Cosmopolitan Homes,* a subsequent purchaser can recover "only for latent or hidden defects," which have been defined as "those manifesting themselves after purchase and which are not discoverable through reasonable inspection." *Cosmopolitan Homes, supra,* 663 P.2d at 1045. The court explained this limitation on the basis that, while "[o]ften a buyer is willing to accept certain [patent] deficiencies in a house in exchange for a lower purchase price," the buyer "cannot be expected to discover structural defects which remain latent at the time of purchase." *Cosmopolitan Homes, supra,* 663 P.2d at 1045–46.

■ A plaintiff need only provide the fact finder with a reasonable basis for calculating actual damages using the relevant measure. *Husband v. Colo. Mountain Cellars, Inc.,* 867 P.2d 57 (Colo.App.1993).

■ Expert testimony is needed only where the issue does not lie within the ambit of common knowledge of ordinary persons. *See, e.g., Am. Family Mut. Ins. Co. v. Allen,* 102 P.3d 333 (Colo.2004) (reasonable investi-

gation and denial of an insured's claim within the common knowledge and experience of ordinary people); *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913 (Colo.1997) (expert testimony not needed to establish violation of Oil and Gas Commission order); *Pomeranz v. McDonald's Corp.,* 843 P.2d 1378 (Colo. 1993) (expert testimony not always required to establish future damages).

■ Resource cites no authority, and we have found none in Colorado, requiring that latent defects be identified through expert testimony. Applying the test of whether such defects were discoverable through reasonable inspection by a home buyer to the eighteen defect categories used by the HOA's damages expert, several of which were broken down into subcategories, the jury could, based on its common knowledge and with a proper instruction, have determined which defects were latent.

■ Further, to the extent Resource argues that latent defects were not identified by *any* evidence at trial, let alone expert testimony, we note the HOA's experts described every defect in detail, including its appearance and location. Also, the HOA introduced numerous photographs depicting these defects. Thus, this evidence would have allowed the jury to determine which defects were latent and award damages appropriately.

Accordingly, we conclude that the trial court erred in dismissing the negligence claims based on the economic loss rule.

## II.  Design Defects

The HOA next contends the trial court erred in directing a verdict because the HOA "made no distinction between design defects and construction defects," and damages resulting from some design defects were not apportioned. Again, we agree.

■■ We review a directed verdict, which should be granted only in the clearest of cases, de novo. *City of Westminster v. Centric–Jones Constructors,* 100 P.3d 472 (Colo. App.2003) (Centric–Jones). A court considering a directed verdict motion must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-

movant.  But if the evidence when viewed in this light is insufficient to support a verdict in favor of the nonmoving party, the issue should not be submitted to the jury. *Huntoon v. TCI Cablevision, Inc.,* 969 P.2d 681 (Colo.1998).

In *Centric–Jones, supra,* 100 P.3d at 477, on which the trial court relied here, the City sued its prime contractor over a water treatment plant project, seeking the total costs of having removed, redesigned, and rebuilt two major elements of the facility, an underground storage tank and a pumping station.

A division of this court concluded that the City "improved its position with different structural elements not part of the original design and corrected undisputed deficiencies in the original design for which [the prime contractor] was not responsible." *Centric–Jones, supra,* 100 P.3d at 479.

The division upheld a directed verdict for the prime contractor because the City failed to provide any basis on which the jury could apportion damages between either (1) the benefit of the City's bargain with the prime contractor and additional benefit to the City from rebuilding the tank and pumping station to new specifications, or (2) particular breaches by the contractor and design errors of others for which the contractor was not responsible.  It explained that "nothing in this record excuses the City from providing the jury with a reasonable, albeit imprecise, basis on which to apportion damages to either loss of the benefit of its bargain with [the contractor] or particular breaches by [the contractor]." *Centric–Jones, supra,* 100 P.3d at 479.

In *Centric–Jones,* the evidence concerning design defects, rebuilding to new designs, and resulting betterment of the City's position involved both the tank and the pumping station.  Here, although the HOA's experts testified that Resource was liable for all of the damages, the experts broke damages down into eighteen different categories, primarily based on the type of defect.  Hence, we conclude that *Centric–Jones* is distinguishable from this case for the following reasons.

First, in *Centric–Jones* the City admitted that design defects plagued both the tank and the pumping station. Here, the record does not indicate that the HOA admitted design defects existed in all the damages categories.

Second, unlike *Centric–Jones*, where the City agreed that it was rebuilding the tank and pumping station to a new design, here the record does not indicate that new designs will be used for the repairs in all the damages categories.

Third, in *Centric–Jones* the evidence was undisputed that the City benefited by rebuilding the tank and pumping station to new designs. Here, the record does not show that in all the damages categories the HOA's position will be improved beyond Resource's obligation to repair defects.

Fourth, in *Centric–Jones* the City did not break out redesign costs, which the contractor argued were significant because the City had made major changes in the design of the tank and pumping station, as a separate damage category. Here, all redesign expenses were included in a professional expenses damage category.

Among the HOA's eighteen damage categories were (1) flashing ($16,425.94), (2) siding and wood trim ($60,186.45), and (3) stairs and landings ($360,089). As explained in the following subsections, the evidence was sufficient for a reasonable jury to have concluded that the damages in at least these three categories were recoverable based solely on construction defects for which Resource was responsible.

### A.  Expert Testimony

Initially, we reject Resource's argument that experts for the HOA should not have been allowed to testify regarding causation or allocation of damages between design defects and faulty construction because both of them acknowledged that they had not been asked so to apportion damages in their initial reports.

Resource did not cross-appeal any of these rulings. To the extent that Resource raises the issue as an alternative ground on which to affirm the trial court, *see, e.g., Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe,* 107 P.3d 402 (Colo.App.2004), we are not persuaded.

A trial court enjoys broad discretion in ruling on the scope of expert testimony, and we disturb such a ruling only if it is manifestly arbitrary, unreasonable, or unfair. *See, e.g., Novell v. Am. Guar. & Liab. Ins. Co.,* 15 P.3d 775 (Colo.App.1999); cf. *Todd v. Bear Valley Vill. Apartments,* 980 P.2d 973 (Colo.1999) (trial court has considerable discretion to decide whether expert opinions were sufficiently disclosed).

Here, the trial court examined the expert reports when Resource objected to expert testimony as beyond the scope of disclosure. The trial court sustained objections to some testimony, but allowed the experts to testify consistently with their reports. Further, where testimony was allowed, Resource cross-examined the experts on alleged inconsistencies in their reports. Thus, we cannot say that the trial court abused its discretion.

We also reject Resource's argument that the HOA's experts were not credible because during cross-examination Resource brought out contrary statements and impeached them with their depositions. Such evidence is not relevant to a directed verdict motion. *See Gossard v. Watson,* 122 Colo. 271, 277, 221 P.2d 353, 356 (1950)(in a motion for a directed verdict, "the credibility of witnesses, the effect and weight of conflicting and contradictory testimony, are all questions of fact, and not questions of law").

### B.  Flashing

With regard to defects in flashing, the HOA's expert testified:

Q: And was flashing required to be used at Park Rise?

A: Yes, it was.

Q: Okay. And what were the requirements to use flashing, what are you referring to?

A: Again, we have sections of the Uniform Building Code specific to flashing requirements. The architectural drawings . . . and, again, there are specific project

specifications' requirements as to installation of flashing.

. . . .

Q:  And can you tell me whether the construction you observed met those standards and requirements?

A:  No, the construction did not comply with the project requirements.

The expert recommended installing new flashing in accordance with the project requirements.  He did not acknowledge any design defects associated with flashing.

### C.  Siding and Wood Trim

The HOA's expert also testified to numerous defects associated with the siding and wood trim.  He did not acknowledge any design defects concerning these elements.

This expert first explained that the vertical trim was buckling because of water damage where the trim had not been primed.  To repair this defect, he recommended "remov[ing] damaged trim pieces and provid[ing] new trim in compliance with the [architect's project manual], correctly primed and painted and reinstall[ing] them."

The expert then testified about areas of the siding and trim where the sealant had failed or the sealant was missing.  Because this defect was found in some buildings and not in others, the expert concluded that "the installer or that particular subcontractor was aware of the requirement, it was just inconsistent." To repair this defect, the expert recommended "clean[ing] out the failed sealant material . . . and seal[ing] as required by the project requirements."

The expert also found that a gap between the concrete foundation and the wood trim was present in some buildings but not in others.  The expert explained, "In not providing a separation between the concrete slab and the wood trim itself, when the concrete does heave it's going to damage the wood trim like you see here."  The expert clarified that the gap was necessary to address normal slab movement, not movement resulting from improper site preparation.  The expert recommended that "the damaged trim elements would need to be removed and new

ones put in place providing the proper gap to allow for that kind of movement."

Although the expert was unsure whether the project specifications called for a gap between the slab and the trim, he stated that it was "common practice" for builders to provide one and ultimately concluded that the siding and trim were not installed in accordance with the project requirements.

Another siding and trim defect was overdriven nails.  The expert testified that "specific requirements from manufacturers' recommendations for the siding on how [ ] nails are to be driven" were not followed.

The expert summarized the siding and trim defects as follows:

Q:  And can you tell me whether you have an opinion as to whether the siding and trim was installed in accordance with the project requirements as you've described them?

A:  No, where I've identified the deficiencies I would say they are not installed per project requirements.

### D.  Stairs and Landings

The HOA's expert testimony on the stairs and landings included the following:

Q:  Now, when you testified yesterday about the problems with the stairs and landings, were you making repair recommendations based on your inspections and observations?

A:  Yes.

Q:  And can you tell me whether your repair recommendations relate to any of the design issues?

A:  No, the accumulation of the defects I identified which resulted in my ultimate recommendation of removing and replacing the stairs in their entirety is based upon the failure due to construction defects.

. . . .

Q:  [C]an you tell me the defects you found with the stairs and landings, what caused the problems that you saw?

A:  Well, the damage is due to water infiltration, being that the water is not being kept out by the metal flashing because the flashing was not provided.  The deck ma-

terial is failing due to water because it's not flashed adequately or at all.

Q: And in that context is that a construction deficiency? A: It is.

Later, the expert reiterated, "[M]y ultimate decision in recommending complete removal and replacement is not based on the design deficiencies that we might have with stairs and landings but is based on the failure that has occurred due to the construction deficiencies."

Nevertheless, Resource points to the expert's testimony on a design issue with the stair handrails:

Q: Did you find any other issues regarding the ... [hand]rails in these locations?

A: Yes, in many locations, you know, predominantly at the center side of the stair where you would have a handrail that would be continuous all the way down the stairs. When you would get to the end of those railings they were very weak and they're just not structurally adequate or connected to the building structure to resist the load that's required by the Building Code.

Despite this design problem, the expert clarified that his repair recommendation was based on construction defects:

Q: [You were asked] about the extension of the handrails as a design issue, do you recall that?

A: I recall that.

Q: Is that something that's going to be included in the repair that you're recommending, based on construction problems you noted?

A: Well, the handrails will need to be Code compliant, yet. Um, had that been the only deficiency I had noticed in the stairs, the repair would have been much simpler. Unfortunately, my recommendation requires removal of the stairs and landings which is going to require removing the railing.

Thus, removing and replacing the stairs and landings to repair the construction defects necessarily included new handrails.

Although the HOA will be in a better position by having handrails that comply with the building code, the record does not show that rebuilding the handrails to be code compliant would cost more than rebuilding them to the original design. To the contrary, the HOA's expert testified that the estimated cost for the stairs and landings damage category was based on the original design and the same materials. Moreover, using photographs of the handrails, a reasonable jury could have found that rebuilding them to code would not be costlier than rebuilding them to the original design.

■ In sum, we conclude that the evidence on these three damage categories was sufficient to allow a reasonable jury to award damages based solely on construction defects. We do not read *Centric–Jones* as requiring that to survive a directed verdict motion, a plaintiff in a construction defect case must apportion every damage category between design problems and construction errors. Hence, because the trial court erroneously directed a verdict on an entire claim, we need not address whether other damage categories lacked evidence of apportionment between design defects and construction flaws. On retrial, any such deficiency can be addressed in limine or by argument to the jury.

Accordingly, we conclude that the trial court erred in directing a verdict on the basis that the HOA failed to present sufficient evidence apportioning damages between design defects and construction flaws. Therefore, the negligence claims must be retried.

## III. CCPA

Finally, the HOA contends the trial court erred in dismissing its CCPA claim. We disagree.

■ To prevail on a CCPA claim, a plaintiff must prove five elements: (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged

practice caused the plaintiff's injury. *See, e.g., Crowe v. Tull,* 126 P.3d 196 (Colo.2006).

Here, the HOA relies on testimony of a Resource employee, who later went to work for the Developer. The employee admitted problems with wet crawl spaces in Building 3, which the employee attempted to conceal from building inspectors by, at supervisory direction, temporarily drying out the crawl spaces with blowers. While still working for Resource, this employee told the Developer about using blowers to dry out the crawl spaces, but also made many inaccurate statements about construction problems.

The HOA emphasizes that, despite this knowledge of the wet crawl spaces, the Developer engaged in an unfair or deceptive sales practice by using sales literature touting "quality construction" and mentioning Resource's name as a selling tool. According to the HOA, the jury could have found Resource liable under the CCPA for having acted in concert with the Developer. But the trial court concluded that the Developer's alleged misrepresentations were mere "puffing" and, therefore, were not actionable under the CCPA. We agree.

▉ "Mere statements of opinion such as puffing or praise of goods by seller is no warranty." *Elliott v. Parr,* 100 Colo. 204, 208, 66 P.2d 819, 821 (1937). But while sellers "have the right to exalt the value or quality of their own property to the highest point credulity will bear," any "statements of value or of quality may be made with the purpose of having them accepted as of fact," and if so should be treated as "representations of fact." *Groves v. Chase,* 60 Colo. 155, 162, 151 P. 913, 915 (1915). *See generally Black's Law Dictionary* 1247 (8th ed.2004) (defining "puffing" as the "expression of an exaggerated opinion—as opposed to factual representations—with the intent to sell a good or service").

Initially, we discern no possible unfair or deceptive trade practice in use of Resource's name by the Developer. Resource was the general contractor for most of the project.

Turning to the phrase "quality construction," we reject the HOA's argument that, as a matter of law, the phrase cannot be treated as puffery in a CCPA action because § 6–1–105(1)(g), C.R.S.2005, includes among deceptive trade practices representations that goods "are of a particular standard, quality, or grade ... if he knows or should know that they are of another."

Although no Colorado appellate decision has addressed puffing in a CCPA claim, many other jurisdictions have done so recently in the context of their respective consumer protection acts. *See, e.g., Miller v. William Chevrolet/GEO, Inc.,* 326 Ill.App.3d 642, 260 Ill.Dec. 735, 762 N.E.2d 1 (2001); *McGraw v. Loyola Ford, Inc.,* 124 Md.App. 560, 723 A.2d 502 (1999); *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350 (1997); *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486 (Tex.2001); *Chandler v. Gene Messer Ford, Inc.,* 81 S.W.3d 493 (Tex.App.2002); *Bayliner Marine Corp. v. Elder,* 994 S.W.2d 439 (Tex.App.1999); *Kessler v. Fanning,* 953 S.W.2d 515 (Tex.App.1997); *Lambert v. Downtown Garage, Inc.,* 262 Va. 707, 553 S.E.2d 714 (2001); *Tietsworth v. Harley–Davidson, Inc.,* 270 Wis.2d 146, 677 N.W.2d 233 (2004).

▉ These cases reached different outcomes by applying the puffery doctrine to their particular facts. But none of them holds that a consumer protection act precludes application of the doctrine as a matter of law. Hence, we conclude that the CCPA does not, as a matter of law, make actionable a statement which would otherwise be mere puffery.

These cases also inform us in applying puffery to the phrase "quality construction." While none of them lays down a bright line test to distinguish puffery from a deceptive trade practice, they apply puffery to consumer protection act claims in a manner consistent with the distinction between general statements of opinion, *see Elliott v. Parr, supra,* and specific representations of fact, *see Groves v. Chase, supra.*

On the one hand, examples of puffery insufficient to sustain a statutory claim include: an engine is "filled to the brim with torque," *Tietsworth v. Harley–Davidson, Inc., supra,* 270 Wis.2d at 172, 677 N.W.2d at 246; "property is in excellent condition," *Lambert v.*

*Downtown Garage, Inc., supra,* 262 Va. at 713, 553 S.E.2d at 717; a car is a "most outstanding value," *McGraw v. Loyola Ford, Inc., supra,* 124 Md.App. at 574, 723 A.2d at 508; and "a small car ... would be safer," *Chandler v. Gene Messer Ford, Inc., supra,* 81 S.W.3d at 501.

On the other hand, statements of existing facts or specific attributes of a product sufficient to sustain a statutory claim include: the vehicle was "executive driven," *Miller v. William Chevrolet/GEO, Inc., supra,* 326 Ill. App.3d at 649, 260 Ill.Dec. 735, 762 N.E.2d at 7; seeds had "very good" standability, would produce an "excellent" yield, and were "tolerant" to specified diseases, *Helena Chem. Co. v. Wilkins, supra,* 47 S.W.3d at 503; a craft was "suitable for ... offshore fishing," *Bayliner Marine Corp. v. Elder, supra,* 994 S.W.2d at 442; a residence did not have "improper drainage" and "previous structural repair," *Kessler v. Fanning, supra,* 953 S.W.2d at 520; and a builder had certain "reputation, experience, and qualifications," *Gennari v. Weichert Co. Realtors, supra,* 148 N.J. at 603, 691 A.2d at 364.

We find particularly persuasive the Fifth Circuit's analysis in *Presidio Enterprises, Inc. v. Warner Bros. Distributing Corp.,* 784 F.2d 674 (5th Cir.1986), where the court applied the common law doctrine of puffery to preclude a claim under the Texas Deceptive Trade Protection Act (DTPA) based on a statement concerning the "quality" of a motion picture. The *Presidio* court examined § 17.46(b)(7) of the DTPA, which like § 6–1–105(1)(g) of the CCPA on which the HOA relies, refers to misrepresentations of the "standard, quality, or grade" of goods. It concluded that the term "quality" is "a measure of degree; as to particular goods quality may be calibrated by standard or grade, as with eggs or meat, or specified by style or model, as with machinery." *Presidio, supra,* 784 F.2d at 686. The court further concluded that the "quality" of a motion picture could not be calibrated in this way.

Hence, we further conclude that a statement about "quality construction" is no more a deceptive trade practice than is a statement about a "quality" motion picture. *See Presidio Enters., Inc. v. Warner Bros.*

*Distrib. Corp., supra.* It represents a statement of opinion, the meaning of which would depend on the speaker's frame of reference, such as mass produced housing versus a custom built home. It is not a specific representation of fact subject to measure or calibration.

Further, and unlike the statements that were held to be factual representations in *Groves v. Chase, supra,* 60 Colo. at 161, 151 P. at 915 ("the land was good corn land, and ... it was of the value of $100 per acre"), "quality construction" is extremely general. Given the context of the Developer's selling, and as to some consumers preselling, units in a new construction project, such a statement is obvious " 'sales talk' language that many people have come to expect from ... dealers." *McGraw v. Loyola Ford, Inc., supra,* 124 Md.App. at 582, 723 A.2d at 512.

Our conclusion that the Developer's statement did not constitute a deceptive trade practice obviates the need to resolve the parties' dispute whether, once the Resource's employee went to work for the Developer, all his knowledge concerning alleged construction problems was imputed to the Developer. *Compare Nielson v. Scott,* 53 P.3d 777 (Colo.App.2002)(principal is treated as having all knowledge that agent has duty to disclose), *with Vail Nat'l Bank v. Finkelman,* 800 P.2d 1342 (Colo.App.1990)(agent's knowledge is not imputed to principal where the agent acts adversely to the principal). This conclusion rests on the general nature of the Developer's statement, regardless of what the Developer may have known of construction problems.

Similarly, we need not address the HOA's argument that the jury could have determined Resource and the Developer acted in concert, thus making Resource jointly liable under § 13–21–111.5(4), C.R.S.2005. Even if we assume that the HOA introduced sufficient evidence of concerted action, we have concluded that the Developer did not engage in a deceptive trade practice under the CCPA, and so the Developer has no liability that could be shared with Resource.

Nor are we persuaded by the HOA's argument that, because § 6–1–105(1)(u),

C.R.S.2005, includes among deceptive trade practices "fails to disclose material information," Resource violated the CCPA by concealing inadequate drainage in Building 3 from the building inspectors.

Even assuming that the jury could have found a deceptive trade practice in Resource's dealings with the building inspectors as to one out of nine buildings in the community, those dealings did not significantly impact the public as actual or potential consumers. *See Coors v. Sec. Life of Denver Ins. Co.*, 91 P.3d 393, 399 (Colo.App.2003) ("Relevant considerations in determining whether a challenged practice significantly impacts the public within the context of a CCPA claim include: (1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice; and (3) evidence that the challenged practice had previously affected other consumers or has the significant potential to do so in the future."), *aff'd in part by an equally divided court and rev'd in part*, 112 P.3d 59 (Colo.2005); *see also Crowe v. Tull, supra.*

Here, as in *Coors, supra,* the HOA put on no evidence that concealment from the building inspectors, as described by the former Resource employee concerning Building 3, significantly impacted the public.

Accordingly, we discern no error in dismissal of the CCPA claim.

The judgment is reversed as to dismissal of the negligence claims, and the case is remanded for further proceedings on those claims. The judgment is affirmed as to dismissal of the CCPA claim.

Judge DAILEY and Judge LOEB concur.